**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF GEORGIA**
**ATHENS DIVISION**

CHRISTIE BURRELL, individually, and on
behalf of all others similarly situated,

     Plaintiff,

vs.

TOPPERS INTERNATIONAL, INC., a
Domestic Profit Corporation, DARNELL
LEWIS GARDNER, individually, and
SANDRA GARDNER, individually,

     Defendants.
_____/

CIVIL ACTION NO.  3:15-cv-00125-CDL

JURY TRIAL DEMANDED


**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF HER**
**MOTION FOR PARTIAL SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

INTRODUCTION……………………………………………………………………...1

ARGUMENT……………………………………………………………………………..2

   I.  PLAINTIFFS ARE EMPLOYEES UNDER THE FLSA……………..………………...2

     A. LEGAL STANDARD FOR DETERMINING EMPLOYEE STATUS…………..……3

     B. TOPPERS CONTROLLED PLAINTIFFS' WORK…………………………………4

        1. Toppers controls entertainers' work through written rules……………………..4

        2. Toppers controls entertainers' manner of dancing…………………………...…5

        3. Toppers controls entertainers' work through fees…………………………….6

        4. Toppers controls work through fines and other discipline……………………..6

        5. Toppers controls entertainers' appearance……………………………………...7

     C. TOPPERS CONTROLS PLAINTIFFS' PROFIT AND LOSS………………………8

     D. TOPPERS'S INVESTMENT EXCEEDS PLAINTIFFS'……………………….......9

     E. ENTERTAINING AT TOPPERS IS NOT SKILLED WORK………………..……...10

     F. THERE IS NO PRESET DURATION OF EMPLOYMENT………………………...10

     G. ENTERTAINERS ARE INTEGRAL TO TOPPERS………………………………11

   II.  THE "OFFSET" DEFENSE FAILS…………………………………………………...11

     A.  Defendants do not include the amounts in their gross receipts……………………13

     B.  Additional factors show that the amounts in question are tips………………………14

  III. THE INDIVIDUAL DEFENDANTS ARE EMPLOYERS   …………………………15

  IV. DEFENDANTS' FLSA VIOLATIONS WERE IN RECKLESS DISREGARD………..16

# TABLE OF AUTHORITIES

**CASES:**

*Antenor v. D & S Farms,*
    88 F.3d 925 (11th Cir. 1996) ........................................................................ 16

*Butler v. PP&G, Inc.,*
    2013 WL 5964476 (D. Md. Nov. 7, 2013)………………………………………....3

*Clincy* v. *Galardi S. Enter., Inc.,*
    808 F. Supp.2d 1326 (N.D. Ga. 2011)…………………………………………..*passim*

*Davila v. Menendez,*
    717 F.3d 1179, 1185 (11th Cir. 2013)....………………………………………………18

*DeLeon-Granados v. Eller & Sons Trees, Inc.,*
    581 F. Supp. 2d 1295, 1314 (N.D. Ga. 2008)…………………………………………18

*Harrell* v. *Diamond A. Entm't, Inc.*
    992 F. Supp. 1343 (M.D. Fla. 1997)…………………………………………..*passim*

*Hart* v. *Rick's Cabaret Int7, Inc.,*
    967 F.Supp.2d 901 (S.D.N.Y. 2013)…………………………………………*passim*

*Henderson v. 1400 Northside Dr., Inc.,*
    2015 WL 3823995 (N.D. Ga. June 19, 2015)....................................................12, 13, 14

*Jeffcoat* v. *State, Dep't of Labor,*
    732 P.2d 1073, 1077 (Alaska 1987)……………………………………………………10

*Martin* v. *Circle CInvest., Inc.,*
    1991  WL 338239 (W.D. Tex. Mar. 27, 1991)……………………………………..3, 6

*Martin* v. *Priba Corp.,*
    1992  WL 486911 (N.D. Tex. Nov. 6, 1992)……………………………………3, 7, 9

*McFeeley* v. *Jackson St. Entm % LLC,*
    47 F. Supp. 3d 260 (D. Md. 2014)……………………………………………3, 9

*Melton* v. *Round Table Rests., Inc.,*
    1971 WL 900 (N.D. Ga. Nov. 8, 1971).........................................................................13

*Morse v. Mer Corp.,*
    2010 WL 2346334 (S.D. Ind. June 4, 2010)………………………………………3, 5, 11

*Perez v. Sanford-Orlando Kennel Club, Inc.,*
    5`5 F.3d. 1150, 1163 (11th Cir. 2008)……………………………………………17, 18

*Reich v. ABC/York-Estes Corp.,*
    157 F.R.D. 688, 670 (N.D. 111. 1994)........................................................13

*Reich* v. *ABC/York-Estes Corp.,*
    1997 WL 264379 ……………………………………………………………………13

*Reich* v. *Circle C. Invest., Inc.,*
    998 F.2d 324 (5* Cir. 1993)……………………………………………………3, 8

*Reich* v. *Priba Corp.,*
    890 F.Supp. 586 (N.D. Tex. 1995)……………………………………………3, 7, 9, 13

*Russell* v. *Promove, LLC,*
    2007 WL *221A110* (N.D. Ga. Aug. 7, 2007……………………………………15, 16

*Rutherford Food Corp. v. McComb,*
    331 U.S. 722, 729 (1947)……………………………………………………………3

*Scantland* v. *Jeffry Knight, Inc.,*
    721 F.3d 1308, 1311-12 (11th Cir. 2013)……………………………………3, 4, 6, 10

*Stevenson v. Great Am. Dream,*
    2013 WL 6880921 (N.D. Ga. Dec. 31, 2013)……………………………………*passim*

*Thompson v. Linda and A., Inc.,*
    779 F. Supp. 2d 139 (D.D.C. 2011)……………………………………………...3, 7, 10

*Thornton* v. *Crazy Horse, Inc.,*
    2012 WL 2175753 (D. Alaska June 14, 2012)……………………………………3, 13, 15

*Vaughan v. M-Entertainment Properties, LLC,*
    2016 WL 7365201 (N.D. Ga. march 15, 2016)………………………..…………3, 12, 15

*Verma* v. *3001 Castor, Inc.,*
    2014 WL 2957453 (E.D. Pa. June 30, 2014)................................................3, 4

*Wales v. Jack M. Berry, Inc.,*
    192 F. Supp. 2d 1269, 1288 (M.D. Fla. 1999)……………………….………………..18

## INTRODUCTION

This case is about an illegal scheme under which Defendants—a mother and son, and the son's corporation—operated a strip club called Toppers, employed the Plaintiffs who danced there as entertainers, failed to pay them any wages whatsoever, and charged them fines and fees as a condition of employment. Hoping to disguise this illegal scheme and offer a purported justification for their failure to pay wages, Defendants labeled Plaintiffs "independent contractors." In truth, there was nothing independent about Plaintiffs' work for Toppers. Toppers controlled nearly every aspect of Plaintiffs' work, making them economically dependent on the club and, thus, employees entitled to wages under the Fair Labor Standards Act ("FLSA").

In an attempt to hedge their bets, it appears that Defendants will attempt to argue that, even if Plaintiffs are employees, Defendants can offset their wage obligations against money Plaintiffs received from Defendants' customers. Defendants are wrong. Plaintiffs received tips, not wages. Defendants never once claimed that money as theirs, as an employer must do with monies it uses to pay wages. Regardless, the FLSA does not allow employers to pass their wage obligations on to their customers. Neither any "contract" nor the amount of tips received dictates a different outcome.

Further, based on the undisputed facts, the individual Defendants are both "employers" under the FLSA, and thus Plaintiffs are entitled to summary judgment finding that both Defendants, Darnell Lewis Gardner and Sandra Gardner are "employers" as defined by the FLSA and jointly employed the Plaintiffs.

Finally, it cannot be disputed that Defendants' instant FLSA violations were knowing, willful and in reckless disregard to their obligations.  Defendants acknowledge that they have long known that they could not treat their employers as independent contractors while: (1)

requiring them to pay mandatory "house fees" in order to pay Defendants' other workers; and (2) setting stringent scheduling requirements for their entertainers.  Nonetheless, for almost 25 years Defendants have done both.  Furthermore, Defendants' have failed to perform even a cursory investigation of their FLSA obligations despite their admission that they have long known that their classification of their entertainers as "contractors" presented a significant legal issue under the FLSA.  For all of these reasons, Defendants' FLSA violations are the very definition of willful and the statute of limitations applicable to Plaintiffs' claim must be held to be 3 years.

Accordingly, the Court should grant Plaintiff's instant motion for summary judgment that: (1) they are employees under the FLSA; (2) that Defendants' affirmative defense requesting an offset fails as a matter of law; (3) that Defendants Darnell Lewis Gardner and Sandra Gardner jointly employed Plaintiffs; and (4) that Defendants FLSA violations were willful such that the statute of limitations applicable to Plaintiffs' claims is three (3) years.[1]

## LEGAL AUTHORITY[2]

## I.    PLAINTIFFS ARE EMPLOYEES UNDER THE FLSA

Courts—including those in the District courts of Georgia and Circuit—have long held

---

[1] Unless otherwise stated, references to "Toppers" or "the club" are meant to reference any Defendant that is ultimately found and/or agreed to be liable as an employer in this litigation. Notably, this Court can properly resolve the question of *employee* status without resolving the question of *employer* status as to each Defendant. *See Stevenson* v. *Great Am. Dream,* 2013 WL 6880921, at *2 (N.D. Ga. Dec. 31, 2013) (citing *Clincy* v. *Galardi S. Enter., Inc.,* 808 F.Supp.2d 1326, 1329 (N.D. Ga. 2011).

[2] Summary judgment is appropriate where there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. If the movant shows the absence of such fact questions, the burden shifts to the nonmovant to show a genuine issue of material fact. *Stevenson,* 2013 WL 6880921, at *1. "A mere scintilla of evidence [from nonmovants] will not suffice; there must be a sufficient showing that the jury could reasonably find for that party." *Id.* (internal quotations omitted).

that entertainers are employees of the strip clubs where they work. *See, e.g., Vaughan v. M-Entertainment Properties, LLC,* 2016 WL 7365201 (N.D. Ga. March 15, 2016); *Stevenson,* 2013 WL 6880921; *Clincy,* 808 F. Supp. 2d 1326; *Harrell* v. *Diamond A Entm't, Inc.,* 992 F. Supp. 1343 (M.D. Fla. 1997); *see also Reich* v. *Circle C. Invest., Inc.,* 998 F.2d 324 (5th Cir. 1993); *McFeeley* v. *Jackson St. Entment LLC,* 47 F. Supp. 3d 260 (D. Md. 2014); *Verma v. 3001 Castor, Inc.,* 2014 WL 2957453 (E.D. Pa. June 30, 2014); *Butler v. PP&G, Inc.,* 2013 WL 5964476 (D. Md. Nov. 7, 2013); *Hart* v. *Rick's Cabaret Int'l, Inc.,* 967 F.Supp.2d 901 (S.D.N.Y. 2013); *Thornton* v. *Crazy Horse, Inc.,* 2012 WL 2175753 (D. Alaska June 14, 2012); *Thompson* v. *Linda and A., Inc.,* 779 F. Supp. 2d 139 (D.D.C. 2011); *Morse* v. *Mer Corp.,* 2010 WL 2346334 (S.D. Ind. June 4, 2010); *Reich* v. *Priba Corp.,* 890 F.Supp. 586 (N.D. Tex. 1995); *Martin v. Priba Corp.,* 1992 WL 486911 (N.D. Tex. Nov. 6, 1992); *Martin* v. *Circle C Invest., Inc.,* 1991 WL 338239 (W.D. Tex. Mar. 27, 1991). The facts underlying this vast body of case law are, in all material aspects, nearly identical to those here, warranting a finding of employee status.

### A. LEGAL STANDARD FOR DETERMINING EMPLOYEE STATUS

To determine employee status, courts look to the "economic reality" of the relationship between parties and whether that relationship demonstrates dependence. *Scantland* v. *Jeffry Knight, Inc.,* 721 F.3d 1308, 1311-12 (11th Cir. 2013). As the Eleventh Circuit has explained, "This inquiry is not governed by the 'label' put on the relationship by the parties or the contract controlling that relationship, but rather focuses on whether 'the work done, in its essence, follows the usual path of an employee.'" *Id.* (quoting *Rutherford Food Corp.* v. *McComb,* 331 U.S. 722, 729 (1947). Courts have viewed the following factors as a guide to determine the economic realities of working relationships in FLSA cases:

1) the nature and degree of the alleged employer's control as to the manner in which the work is to be performed;
2) the alleged employee's opportunity for profit or loss depending upon his managerial skill;
3) the alleged employee's investment in equipment or materials required for his task, or his employment of workers;
4) whether the service rendered requires a special skill;
5) the degree of permanency and duration of the working relationship; and
6) the extent to which the service rendered is an integral part of the alleged employer's business.

*See, e.g., Scantland,* 721 F.3d at 1311-12.   Notably, the overarching question of whether a worker is in business for herself or is economically dependent on someone else's business for the chance to render services involves an examination of the totality of the circumstances; no one factor listed above is determinative. *Id.*

Critically, the circumstances must be viewed in light of the FLSA's broad definition of employment, under which one who is "suffered or permitted" to work is employed. U.S. Dep't Labor, Administrative Interpretation, No. 2015-1 ("A.I. 2015-1") (**EXHIBIT 1**) at 3 "The 'suffer or permit' standard was specifically designed to ensure as broad a scope of statutory coverage as possible," *(id.)* and as the United States Department of Labor recently reiterated, "applying the economic realities test in view of the expansive definition of 'employ' under the [FLSA], most workers are employees." *Id.* at 2. The Plaintiffs here are no different.

**B. TOPPERS CONTROLLED PLAINTIFFS' WORK**

The undisputed facts articulated in Plaintiff's accompanying Statement of Undisputed Facts ("SOF"), incorporated here by reference, show that Toppers exercised immense control over Plaintiffs (also referred to as "entertainers" or "dancers").

**1.  Toppers controls entertainers' work through written rules**

"The presence of club-imposed written and unwritten guidelines for dancers' conduct indicate control and weighs in favor of employee status." *Verma,* 2014 WL 2957453, *6; *see,*

*e.g., Stevenson,* 2013 WL 6880921, at *4; *Hart,* 967 F. Supp. 2d at 913-20; *Clincy,* 808 F. Supp. 2d at 1344-45; *Morse,* 2010 WL 2346334 at *3; *Harrell,* 992 F. Supp. at 1349-50. And so it is here. Toppers distributed documents to entertainers upon hire, which list numerous club expectations, including those governing precisely when and how the entertainers' were required to dance and disrobe, entertainers' appearance, scheduling, arrival to and departure from the club and payments to club and its agents. (SOF, ¶¶ 38-69). The documents also list specific behavior required by Toppers (*e.g.,* "When a customer asks if you would like a drink! Always say YES!!!). The documents also contain a litany of offenses for which entertainers are subject to fines ranging from $10 to $200, such as not dancing on stage or leaving without permission, and requiring entertainers to work the entire length of a shift, dance a full three (3) songs during all "stage sets," and to perform while onstage. *(Id.)* These are just some examples. The numerous documents and their self-emphasized bolded and capitalized content are canvassed in the accompanying SOF and exhibits referenced therein. *(Id.)* Notably, while there may not always be strict enforcement or that not all listed guidelines are always enforced does not undercut the club's control. The presence of the rules and threatened punishment— such as fines, suspension, and termination for violations of the same—are enough to show control. *See, e.g., Hart,* 967 F. Supp. 2d at 918 ("The mere threat.... realistically operated as a sword of Damocles over the dancers, helping ensure dancer compliance with the Guidelines.") As explained by Defendant, Darnell Lewis Gardner, a lot of the rules and fines are in place as a "scare tactic" to get the entertainers to act in compliance with Toppers' wants and expectations.  (SOF, ¶ 65).

## 2.  Toppers controls entertainers' manner of dancing

The manner and times at which entertainers "dance" are dictated by Toppers. Independent contractors would have the freedom to choose how, when and whether to dance on

stage; the entertainers at Toppers do not. Rather, they are called to stage by the club's disc jockey ("DJ"), who determines how many entertainers can be on stage at one time; cannot dance until their name is called even if they missed their turn; can be fined for missing a turn or leaving stage before a song is done, and must disrobe in the precise sequence mechanically required by Defendants. (*Id.*, ¶¶ 53-59).  These are classic examples of a club's control over its entertainers' work. *See, e.g., Clincy,* 808 F. Supp. 2d at 1333 ("[D]ancers may refuse to dance on stage when called, but may be fined...."); *Harrell,* 992 F. Supp. at 1349-1350 (as to stage rotation); *see also* A.I. 2015-1 at 14 ("If the nature of a business requires a company to exert control over workers to the extent that [the employer] has allegedly done, then that company must hire employees, not independent contractors." (quoting *Scantland,* 721 F.3d at 1316)).

### 3.  Toppers controls entertainers' work through fees

Toppers further controls its entertainers by requiring that they pay "house fees," charging them a higher fee the later they arrived. (SOF, ¶¶ 45-50).  While this had the effect of pressuring entertainers to come to work earlier, the club also overtly required entertainers to work a minimum of 4 nights per week and to work at least one of the slow nights (Monday, Tuesday, Wednesday) each week. *(Id.,* ¶¶ 39-44, 50); *compare, Stevenson,* 2013 WL 6880921, at \*4 (listing house fees among examples of control); *Clincy,* 808 F. Supp. 2d at 1334 (same).[3]

### 4.  Toppers controls work through fines and other discipline

The authority to discipline is clear evidence of a club's control over its entertainers. *See, e.g., Hart,* 967 F. Supp. 2d at 917-19; *Clincy,* 808 F. Supp. 2d at 1332; *Martin* v. *Circle C,* 1991 WL 338239, at \*3 ("Numerous rules were promulgated... and offenders were fined for infringements."). At Toppers, management dispensed discipline through fines for various

---

[3] Toppers also requires entertainers to pay "tip outs" each shift to the DJ and house mom (i.e., dressing room attendant). (SOF, ¶¶ 60-63).

conduct, including not working enough shifts or certain days,[4] not getting dressed and out of the dressing room within fifteen minutes of arriving at the club, and failing to work a scheduled day without notice to the club. (SOF, ¶¶ 30-33, 39, 50, 55, 68, 69). Toppers also distributed a document entitled "Independent contract Re-Instatement Fee's" to its entertainers listing fees/fines that would be charged for thirty (30) different rules violations (in lieu of "immediate contract termination")—for example, "chewing gum on stage." (SOF, ¶¶ 68-69). In fact, Toppers has put entertainers on "probation" and has suspended and fired them. (*Id*.). In sum, entertainers must abide by club rules or suffer the consequences.

### 5.  Toppers controls entertainers' appearance

If entertainers were independent contractors, they would be able to choose what to wear, when to wear it, and how to otherwise present their chosen image to customers. Toppers does not afford entertainers that discretion. Rather, it requires that entertainers fit the *club's* image (SOF, ¶¶ 51-52), instructing its entertainers on what to wear or how to do their hair and makeup. (*Id*.). These examples of control limit entertainers' discretion to choose how to be attractive to customers. All of this runs counter to independence. *See, e.g., Hart,* 967 F. Supp. 2d at 919 ("[A] club's... instructions to a dancer of the need to lose weight or otherwise cease performing [and] request that an entertainer take time off to lose some weight... are unavoidably means of

---

[4]  Importantly, a club's control over when entertainers work and related scheduling requirements indicate control and employee status. *See e.g., Clincy,* 808 F.Supp.2d at 1344-1345; *Thompson,* 779 F.Supp.2d at 148; *Reich* v. *Priba,* 890 F. Supp. at 592; *Harrell,* 992 F. Supp. at 1350; *Martin* v. *Priba,* 1992 WL 486911, *4. Here, the great level of control is apparent as discussed above. (*See infra).* Defendants will undoubtedly argue that entertainers could, within the framework of days and shifts set by Defendants, choose when to work. This does not negate the expansive control discussed above. *See* A.I. 2015-1 ("[Workers' control over the hours when they work is not indicative of independent contractor status."); *Stevenson,* 2013 WL 6880921, at *4 ("Defendants argue that the entertainers could set their own schedules. But this was true in several cases where the court found the entertainers were nonetheless employees. Control over scheduling is minimal compared to all of the elements of the job that [the club] controlled.").

exercising control over her."); *Clincy,* 808 F.Supp.2d at 1332; *Reich v. Circle C,* 998 F.2d at 327.

In light of the totality of the circumstances described above, there is no question that the entertainers at Toppers are employees as a matter of law. The most meaningful parts of the exotic dancing occupation—when and how to work, appearance, and the manner of dance and disrobing—are all controlled by Toppers, not the entertainers. This factor weighs in favor of employee status.

### C.  TOPPERS CONTROLS PLAINTIFFS' PROFIT AND LOSS

"In considering whether a worker has an opportunity for profit or loss, the focus is whether the worker's managerial skill can affect his or her profit and loss." A.I. 2015-1 at 7. Here, entertainers exercised no managerial skill in order to increase the work available to them or resultant profits. Rather, Toppers controlled the majority of factors contributing to profit or loss. For example, in order for entertainers to make any money on a given night at Toppers there must be customers in the club with money to spend. Toppers is the entity that controls the factors related to customer volume and spending.

Toppers determines the hours it is open, which customers can enter the club, furnishes and maintains control over the aesthetics in the club, maintains the bar at the club, pays for utilities and liability insurance at the club, and handles and pays for the marketing which draws customers in, including social media, print, radio, and a promotor. (SOF, ¶¶ 73-77*).* In contrast, an independent contractor would have control over these determinants of her profits. *See Stevenson,* 2013 WL 6880921, at *4 ("[The club] bore the vast majority of overhead costs [and] also had more of an impact on potential profits. It was 'primarily responsible for attracting customers..., decisions about marketing and promotions for the Club, its marketing and promotions for the Club, its location, its maintenance, aesthetics, and atmosphere, and food and

alcohol availability and pricing are made by' [the club]." (quoting *Clincy,* 808 F. Supp. 2d at 1346)); *Reich* v. *Priba,* 890 F. Supp. at 593 ("The club controls... advertising, without which... entertainers could not survive.").

What is more, Toppers determines whether entertainers can be in the club at all for the chance to earn money, determines the minimum amount customers must pay for a dance (eliminating entertainers' ability to fully negotiate rates), and requires entertainers to pay the club. (SOF, ¶¶ 5, 45-50, 70-71). This all weighs in favor of employee status. *See, e.g., McFeeley,* 47 F. Supp. 3d at 270-71.

### D. TOPPERS' INVESTMENT DWARFS PLAINTIFFS' MINIMAL INVESTMENT

Defendants provide the huge sums necessary to operate the club, including the building in and stage on which entertainers dance, the furnishings and liquor for customers, advertising, music, phones, insurance and utilities, among other things. (*See* SOF ¶¶72-77). This vast capital outlay—with rent alone exceeding $100,000.00 each year at issue (in contrast to entertainers' comparatively minimal attire expenses and fees and fines) shows that the club, not entertainers, puts profits and the potential for loss on the line. (*Id.*). As one court stated:

> Defendant would have us believe that a dancer [ ] could hang out her own shingle, pay nothing in overhead,-no advertising, no facilities, no bouncers,- and draw in a constant stream of paying customers. A dancer [ ] risks little more than her daily "tip out" fee, the cost of her costumes, and her time. That a dancer may increase her earnings by increased 'hustling' matters little. As is the case with the zealous waiter at a fancy, four star restaurant, a dancer's stake, her take and the control she exercises over each of these are limited by the bounds of good service; ultimately, it is the restaurant that takes the risks and reaps the returns.

*Harrell,* 992 F. Supp. at 1352. In short, "but for [Defendants' provision of the lavish work environment, the dancers at the club likely would earn nothing." *Martin* v. *Priba,* 1992 WL 486911, *5. This factor weighs in Plaintiffs' favor.

9

### E.  ENTERTAINING AT TOPPERS IS NOT SKILLED WORK

Courts consistently hold that any skill required to be a nude dancer like Plaintiffs here does not rise to the level of "business skills, judgment, and initiative" to show economic independence. A.I. 2015-1 at 10; *see e.g., Stevenson,* 2013 WL 6880921, at *5 ("Taking your clothes off on a nightclub stage and dancing provocatively are not the kinds of special skills that suggest independent contractor status."); *Hart,* 967 F. Supp. 2d at 920 ("Although efforts by dancers to cultivate customers surely enhanced the money the customers paid them, such 'hustling' is not skilled work. And every court to consider such a 'hustling' argument by a strip-club proprietor has rejected it." (citing cases)). The same is true here. Toppers does not require managerial skill of any kind; rather, appearance and the ability to take off one's clothes without hesitation are the driving factors when it comes to hiring. (SOF, ¶¶ 78-82). Entertainers need not have prior dance or strip club experience and are not even required to dance during the hiring process. (*Id.*). These facts cut against a finding of specialized skill. *See Thompson,* 779 F. Supp. 2d at 150 ("While the Court does not rule out the possibility of the rare case involving a form of nude dancing that reaches the level of high art, requiring extensive skill..., the defendants' argument barely merits consideration here because nothing in the record indicates that 'artistic ability' had anything to do with eligibility...."). Again, this factor weighs in Plaintiffs' favor.

### F.  THERE IS NO PRESET DURATION OF EMPLOYMENT AND ENTERTAINERS OFTEN WORK FOR TWO YEARS OR MORE

"Generally employees are hired for indefinite periods, whereas independent contractors work for periods established by contract." *Jeffcoat* v. *State, Dep't of Labor,* 732 P.2d 1073, 1077 (Alaska 1987). Further, contracts for lengthy terms indicate employee status. *Scantland,* 721 F.3d at 1318. Further still, [e]ven if the working relationship lasts weeks or months instead of years, there is likely some permanence or indefiniteness to it as compared to an independent

contractor...." A.I. 2015-1 at 12. All of this supports employees status in this case because: (1) entertainers at Toppers work at the club with no pre-specified end date or contract completion date; (2) the club's scheduling requirements of certain days per week indicate a level of permanency; (3) as with any typical employment relationship, entertainers' employment is at will with the club being able to terminate the relationship at any point; and (4) many entertainers worked at the club for years. (SOF, ¶¶ 83-85). This factor, too, weighs in favor of Plaintiffs.

### G.  ENTERTAINERS ARE INTEGRAL TO TOPPERS

Toppers is a strip club. Put bluntly, strippers are integral to strip clubs. *Morse,* 2010 WL 2346334, at *6 ("[E]xotic dancers are obviously essential to the success of a topless nightclub." (quoting *Harrell,* 992 F. Supp. at 1352)). No reasonable jury could conclude otherwise given that customers come to the club to see entertainers; the club is known for its entertainers; the club's trademark includes the silhouette of a voluptuous woman; the club's marketing is replete with images of scantily-clad or nearly nude women; the club is designed around a stage on which entertainers dance; there are dozens of entertainers on the roster at any one time; and, as Defendant DLG freely acknowledged the club cannot operate without entertainers. (SOF, ¶ 88.). "No reasonable jury could conclude that exotic dancers were not integral to the success of a club that marketed itself as a club for exotic dancers." *Hart,* 967 F. Supp. 2d at 921.

In sum, the economic realities overwhelmingly weigh in favor of employee status. As such, summary judgment should be granted for Plaintiffs.

## II.  THE "OFFSET" DEFENSE FAILS

The Plaintiffs in this case received no wages whatsoever from Defendants. (SOF, ¶¶ 7-8, 89-90). Rather, Plaintiffs' sole income was money given directly to them by Toppers's customers. (*Id.*). No Defendant ever claimed any portion of this money in its gross receipts; nor

did the club otherwise claim the money or consider it its own.  Indeed, DLG admitted that Defendants "have no idea what the girls make."  (*Id.,* ¶ 93).

Now, however, facing substantial wage liability, it appears that Defendants suddenly want to claim the money entertainers received from customers as a wage that can satisfy the club's obligations under the FLSA. *See* D.E. 25, Seventh Defense (asserting set-off); *see also* Interrogatory Responses, ¶ 7 ("The seventh defense is based upon the fact that Plaintiffs received compensation tips by patrons.").

Defendants' affirmative defense is nothing more than a transparent request for a "do-over" now that litigation has revealed their illegal misclassification and nonpayment scheme. Defendants want to re-characterize the amounts entertainers received from customers as a "service charges." Such an argument is unquestionably contrary to law—must be rejected and their affirmative defense of set-off must be denied. *Vaughan,* 2016 WL 7365201, at *10-11 (rejecting defense of set-off under virtually identical circumstances).

The FLSA regulation states that "service charges and other similar sums which become part of the employer's gross receipts are not tips for the purposes of the [FLSA]. Where such sums are distributed by the employer to its employees, however, they may be used in their entirety to satisfy the monetary requirements of the Act." 29 C.F.R. § 531.55. The question, then, is whether the money entertainers receive from a strip club's customers falls within the category of "sums" that can be used to offset the FLSA's minimum wage requirements. Nearly every court to examine this issue on the merits has rejected the club's offset argument. *See e.g., Henderson* v. *1400 Northside Dr., Inc.,* 2015 WL 3823995, at *3-4 (N.D. Ga. June 19, 2015) ("[T]he fees received by dancers for entertainment provided on the main stage, the main floor, the VIP lounge, and the VIP rooms were obviously 'tips,' and so they may not be used to offset

the Defendant's minimum wage obligations under the FLSA.... many courts have considered this question in the context of adult entertainment and have agreed with the Plaintiffs' position."); *Hart,* 967 F. Supp. 2d at 926-35; *Harrell,* 992 F. Supp. at 1358; *Reich* v. *ABC/York-Estes Corp.,* 1997 WL 264379, at *5-7; *Reich v. ABC/York-Estes Corp.,* 157 F.R.D. 688, 670 (N.D. 111. 1994); *Reich* v. *Priba Corp.,* 890 F. Supp. at 594-95; *Thornton,* 2012 WL 2175753, at *9. This Court should do the same.

### A.  Defendants do not include the amounts in their gross receipts

The FLSA does not permit an offset for service charges or other similar sums where the employer does not include those amounts in its gross receipts:

> [S]ervice charges and other similar sums ***which become part of the employer's gross receipts*** are not tips for the purposes of the [FLSA]. ***Where such sums*** are distributed by the employer to its employees, however, they may be used in their entirety to satisfy the monetary requirements of the [FLSA].

29 C.F.R. § 531.55 (emphasis added); *Henderson,* 2015 WL 3823995, at *4 ("[F]or a fee to constitute a service charge and therefore be properly applied against an establishment's statutory minimum-wage duty, it must have been included in the establishments gross receipts.") (quoting *Hart,* 967 F.Supp.2d at 929); *Reich* v. *ABC/York-Estes Corp.,* 1997 WL 264379, at *5 ("[A]n employer must include payments in its records as gross receipts as a prerequisite to 'service charge' classification under the FLSA."). Where that money, however, does not enter into the employer's gross receipts and remains a tip, it is "the property of the employee... [and t]he employer is prohibited from using an employee's tips...for any reason other than that which is statutorily permitted...." *See* 29 C.F.R. § 531.52; *Melton* v. *Round Table Rests., Inc.,* 1971 WL 900, at *4 (N.D. Ga. Nov. 8, 1971) ("[0]nly when there is a fixed service charge prescribed by the employer ***and which becomes a part of it's [sic] gross receipts*** that such charges may be converted into wages...." (emphasis added)).

13

Here, Toppers has admitted that it does not record any amounts entertainers receive from customers anywhere, let alone in its gross receipts. (SOF, ¶ 93 ("we have no idea what the girls make")). The complete failure to include in amounts in their gross receipts alone is fatal to Defendants' affirmative defense of offset. An employer simply cannot satisfy its wage obligations merely by directing its customers to pay its employees; rather, the payments must come from the employer's own accounts. If this were not the case, employers in any service industry would simply direct their customers to pay the employees directly under the guise of a "service charge." Such a scheme would be tremendously beneficial to employers, who could avoid paying both corporate and payroll tax on such amounts, while at the same time still claiming to satisfy their wage obligations. Here, Defendants did just that. They admittedly never treated the money as their own or paid taxes on it. The money never belonged to Defendants and Defendants never acted like it did. (*Id.*). Defendants cannot now claim the money as their own in an after-the-fact attempt to manufacture an escape hatch from their liability in this lawsuit. They freely acknowledge that all monies received from patrons are tips, not service charges, and therefore cannot be used to offset their wage liability.

### B.  Additional factors show that the amounts in question are tips

Gross receipts aside, the other undisputed facts of this case militate towards finding that the money in question is a tip, not service charge. For example, when customers pay entertainers, they pay the entertainer directly and not through a middleman at the club. (SOF, ¶ 92). This, alone, defeats Defendants' argument. 29 C.F.R. § 531.55 ("Where such sums *are distributed by the employer to its employees,* however, they may be used in their entirety to satisfy the monetary requirements of the [FLSA]." (emphasis added)); *see Henderson,* 2015 WL 3823995, at *4 ("[S]ervice changes' must be distributed by the employer in order to count towards wages.'

Here, most of the payments... were made directly to dancers.... those payments may not be classified as 'service charges.'" (quoting Hart, 967, F. Supp. 2d at 929)). Further, Toppers merely sets a minimum amount customers are to pay for a dance, does not handle the money entertainer receive or a retain a portion thereof, and makes no effort to track the number of dancers or amount of money entertainer receive. (SOF, ¶¶ 7-8, 89-90). All of these facts indicate that the money in question is a tip. *See Vaughan,* 2016 WL 7365201, at *10-11; *Thornton,* 2012 WL 2175753, at *9.

## III.   THE INDIVIDUAL DEFENDANTS ARE EMPLOYERS

> [A] joint employment relationship generally [exists]... [w]here the employers are not completely disassociated with respect to the employment of a particular employee and may be deemed to share control of the employee, directly or indirectly, by reason of the fact that one employer controls, is controlled by, or is under common control with the other employer.

29 C.F.R. § 791.2(b)(3)). Here, there is no argument that the individual Defendants are "completely disassociated with respect to the employment" of entertainers at Toppers. In fact, quite the opposite. They hire entertainers and have authority over entertainers being disciplined, including firings. (SOF, ¶¶ 2, 9-23). Indeed, Darnell Lewis Gardner, currently the sole shareholder of Toppers, admits that he "run[s] everything" on behalf of Toppers, and "set[s] all club policy." (*Id.*, ¶ 14). Likewise, Sandra Gardner, the original owner of Toppers, has served as a house mom and has hired/fired, disciplined and otherwise served as the entertainers day-to-day direct supervisor throughout he class period. (*Id.*¶ 16-23). All of this amply demonstrates employer status. *See Russell* v. *Promove, LLC,* 2007 WL 2274770, at *3 (N.D. Ga. Aug. 7, 2007) (listing, among factors contributing to employer status, the power to hire and fire and supervision

and control of conditions of employment,[5] and explaining that "the overwhelming weight of authority is that a corporate officer with operational control of a corporation's covered enterprise is an employer along with the corporation, jointly and severally liable under the FLSA," and that "[e]ven if a defendant does not exercise exclusive control over all the day-to-day affairs of the employer, so long as he or she possesses control over the aspect of employment alleged to have been violated, the FLSA will apply....") (quotations and citations omitted). Critically, *Defendants do not contest that Darnell Lewis Gardner would be an employer* in the event Plaintiffs are found to be employees, and the facts regarding Sandra Gardner's day-to-day authority over the entertainers is arguably even more compelling. Accordingly, summary judgment should be granted for Plaintiffs on undisputed joint employer status of the individual Defendants, Darnell Lewis Gardner and Sandra Gardner.

## IV.    DEFENDANTS' FLSA VIOLATIONS WERE IN RECKLESS DISREGARD

The statute of limitations under the FLSA is two years, unless there is proof of a willful violation of the statute.   29 U.S.C. § 255(a).   If a willful violation is shown, the statute of limitations extends to three (3) years.   *Id.* To show a willful violation, a plaintiff must present evidence "that the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute."  A violation will be deemed "in reckless disregard … if the employer should have inquired further into whether its conduct was in compliance with the Act, and failed to make adequate further inquiry."  *De Leon-Granados v. Eller & Sons Trees, Inc.*, 581 F. Supp. 2d 1295, 1314 (N.D. Ga. 2008) (quoting 29 C.F.R. § 578.3(c)(3)).  Here, the undisputed facts show that Defendants have known for twenty-five years that they could not

---

[5]   Importantly, the totality of the circumstance surrounding the economic realities governs the analysis. *See Russell,* 2007 WL 2274770, at *3-4; *Antenor v. D & S Farms,* 88 F.3d 925 (11th Cir. 1996) (applying eight economic realities factors).

charge their entertainers "house fees" or mandate that they tip out their other workers.  (SOF, ¶¶ 101-105).  Likewise, Defendants acknowledge that they have always known that they could not exert control over entertainers to the extent that they wished to classify them as independent contractors. (*Id*.). They did both nonetheless and have always done so. (*Id*.). Further, Defendants purposely avoided getting a legal consult or even concluding their initial claimed consult[6], recognizing that their classification of their entertainers as independent contractors rather than employees presents an issue under the FLSA. (*Id*., ¶¶ 97-99). Defendants are also well-aware that entertainers have repeatedly sued adult clubs in cases virtually identical to this one. (*Id*., ¶¶ 106-109).   Nonetheless, Defendants only action has been to require their entertainers to sign new contracts, under which they give up their right to sue Defendants in court, and are required to "elect" whether they will be treated as employees or contractors. (*Id*., ¶ 109). Under these circumstances, Defendants' FLSA violations are willful and/or in reckless disregard and Plaintiff's claims are subject to a three (3) year statute of limitations.

The evidence here unquestionably demonstrates that Defendants knew of the FLSA's requirements regarding independent contractors (and employees) for the entire approximately twenty-five (25) years that they have been in business.  Nevertheless, Defendants disregarded their knowledge, charged their entertainers "house fees," required them to tip out other workers, and required them to work set schedules. In other words, Defendants intentionally misclassified their entertainers as "independent contractors" and refused to comply with their legal duty to pay Plaintiffs minimum wages that they were well aware were due to them.   This conduct

---

[6] The Code of Federal Regulations defines reckless disregard as the "failure to make adequate inquiry into whether conduct is in compliance with the Act." *Alvarez Perez v. Sanford-Orlando Kennel Club, Inc*., 515 F.3d 1150, 1163 (11th Cir. 2008) (quoting 5 C.F.R. § 551.104).

demonstrates willful violations of the FLSA and triggers the three (3) year limitations period for willful violations. *See Davila v. Menendez*, 717 F.3d 1179, 1185 (11th Cir. 2013) ("An employer knowingly violates the Act if he disregards the minimum wage laws deliberately or intentionally, such as by ignoring 'advice from a responsible official ... that the conduct in question is not lawful.'" (quoting 29 C.F.R. § 578.3(c)(2).")); *DeLeon-Granados*, 581 F.Supp.2d at 1315, citing *McLaughlin v. Richland Shoe Co.,* 486 U.S. 128, 133, 108 S.Ct. 1677, 100 L.Ed.2d 115 (1988)[7]; *Alvarez Perez v. Sanford-Orlando Kennel Club, Inc*., 469 F. Supp. 2d 1086, 1093 (M.D. Fla. 2006); *Wales v. Jack M. Berry, Inc.*, 192 F. Supp. 2d 1269, 1288 (M.D. Fla. 1999).

Given the above-undisputed facts, Defendants' FLSA violations are willful and in reckless disregard as a matter of law.  Thus, the Court is due to hold that same are governed by a three (3) year statute of limitations here.

Respectfully submitted this 8th day of March, 2017.

**MORGAN & MORGAN, P.A.**

*/s/  Andrew R. Frisch*
Andrew R. Frisch
GA Bar No. 366105
600 N. Pine Island Road, Suite 400
Plantation, FL 33324
T: (954) WORKERS; F: (954) 327-3013
afrisch@forthepeople.com

***ATTORNEYS FOR PLAINTIFF AND THE COLLECTIVE CLASS***

---

[7] A violation of the FLSA is "willful" if the employer "either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the FLSA." *McLaughlin,* 486 U.S. at 133, 108 S.Ct. 1677.

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing has been sent via U.S.

Mail and electronic mail to all counsel listed above, this <u>8th</u> day of March, 2017.

***<u>/s/ Andrew R. Frisch</u>***
Andrew R. Frisch
