UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION

CHRISTIE BURRELL, individually, and
on behalf of all others similarly situated,

      Plaintiff,

vs.

TOPPERS INTERNATIONAL, INC., a
Domestic Profit Corporation, DARNELL
LEWIS GARDNER, individually, and
SANDRA GARDNER, individually,

      Defendants.

_____/

CIVIL ACTION NO.  3:15-cv-00125-
CDL

JURY TRIAL DEMANDED

## PLAINTIFF'S STATEMENT OF UNDISPUTED FACTS

### I.   GENERAL BACKGROUND

1.  At all times since 1992, Defendants have operated an adult night club under the name of Toppers International Cabaret ("Toppers") at 100 N. Jackson Street, Athens, Georgia. *See* 30(b)(6) Deposition of Darnell Gardner ("30(b)(6) Dep."), excerpts attached as **EXHIBIT A**, p. 10; Defendants' Answer, D.E. 25, ¶¶ 52-53.

2.  From 1992 until 2004, Defendant, Sandra Gardner ("SG") was the sole owner of Toppers, and operated under the corporate name Mardi Gras Inc.

*See* 30(b)(6) Dep., pp. 42-43, 71.   In 2004, Defendant, Darnell Lewis Gardner ("DLG"), SG's son, changed the corporate name to Toppers International, Inc., and became the sole owner of Toppers.  *Id.*  Since that time, DLG has remained the sole owner of Toppers. *Id.*

3.   Toppers is an adult entertainment or gentlemen's club that features nude dancers ("entertainers").  *Id.*, p. 12:10-13, 68:20-69:3; D.E. 25, ¶¶ 52-53.

4.   Entertainers' primary job duties are to perform dances—at patrons' tables ("table dances"), in the VIP area, or in an executive room—for the entertainment of Toppers' patrons.  *See* Defendants' Responses to Plaintiffs' First Set of Interrogatories ("Response to Interrogatories"), attached as **EXHIBIT B**, ¶ 4; *see also* 30(b)(6) Dep., pp. 25, 85, 102-03, 105; *see also* D.E. 25, ¶ 26.

5.   Toppers sets the minimum price at $10 per song for regular table dances, $30 per song for lap dances, and $250 per hour for entertainers' time providing private dances in an Executive Room. *See* 30(b)(6) Dep. at pp. 91:10-13, 103:22-104:25, 106:7:11; *see also* Dancer General Information, attached as   **EXHIBIT C**, pp. 3-4; D.E. 25, ¶ 22.

6.   All entertainers who perform at Toppers have been characterized as independent contractors throughout the class period. D.E. 25, ¶ 112; EXHIBIT B, ¶ 7; Defendant Toppers International, Inc.'s Responses to

Plaintiff's First Request for Admissions ("RFA Responses"), attached as **EXHIBIT D**, ¶¶ 35, 37, 38.

7. Toppers does not pay entertainers wages or include them in payroll. *See* Response to Interrogatories, ¶ 14; RFA Responses, ¶ 36; *see also* 30(b)(6) Dep., p. 89:12-21; Deposition of Christie Burrell ("Burrell Dep."), excerpts attached as **EXHIBIT E**, p. 14:8-14.

8. Rather, to earn money for working at Toppers, entertainers rely solely on tips from customers. *Id*.

### A. DEFENDANT, DARNELL LEWIS GARDNER'S OWNERSHIP OF TOPPERS INTERNATIONAL, INC. AND CONTROL OF TOPPERS

9. Defendant, Darnell Lewis Gardner ("DLG") was deposed on January 30, 2017, as the 30(b)(6) designee for Toppers International, Inc. *See* EXHIBIT A, 30(b)(6) Dep.

10. At all times from three years prior to the filing of this action through the present, DLG has been the sole shareholder, director, and officer of Toppers International, Inc., and he operates and manages the club. D.E. 25, ¶ 31.

11. Toppers International, Inc. is the sole owner of Toppers and DLG is the sole shareholder of Toppers International, Inc. *Id.; see also* 30(b)(6) Dep., p. 42:7-16.

12. DLG is responsible for the daily operations of Toppers. D.E. 25, ¶ 33.

13.   DLG has responsibility for the supervision of the entertainers at Toppers, is responsible for the compensation (or lack thereof) paid to entertainers at Toppers, hires/fires workers on behalf of Toppers, directs and supervises Toppers' workers, signs on Toppers' business accounts, and has the authority to make decisions regarding fines imposed on employees and capital expenditures on behalf of Toppers.  D.E. 25, ¶¶ 33-36; 30(b)(6) Dep., p. 45:3-9.

14.   DLG "run[s] everything" on behalf of Toppers, "set[s] all club policy," and disciplines people on behalf of Toppers.  *See* 30(b)(6) Dep., pp. 37:10-12, 45:3-9; 50:3-5.

### B.   DEFENDANT SANDRA GARDNER

15.   Defendant, Sandra Gardner is the mother of Defendant, Darnell Lewis Gardner.  *See* 30(b)(6) Dep., p. 5:15-20.

16.    From 1992 until 2004, Defendant, Sandra Gardner ("SG") was the sole owner of Toppers, and operated under the corporate name Mardi Gras Inc.  *Id*., p. 42:17-25.

17.   Since transferring control of Toppers to her son DLG, Sandra Gardner has consistently worked at Toppers as a house mom, between once every 2 weeks and 2-3 times a week.  *Id.,* pp. 39:19-40:5, 41:3-18, 43:13-15.

18.   SG has performed materially the same duties as a house mom throughout

the class period.  Deposition of Sandra Gardner ("SG Dep."), attached as **EXHIBIT F**, p. 14:14-15:11.

19.   As with all house moms, throughout the class period SG has always been responsible for auditioning entertainers and making hiring decisions on days she works as the house mom at Toppers.  *See* 30(b)(6) Dep., pp. 45:16-47:11.

20.   Likewise, throughout the class period, SG has always been responsible for terminating entertainers and recommending to DLG that entertainers be terminated if appropriate.  *Id*., pp. 48:9-20, 49:7-11.  DLG defers to SG's recommendations regarding the termination of entertainers.  *Id.,* p. 49:7-16 ("I give her the same deference.").

21.   SG terminated opt-in Plaintiff April Thomas on behalf of Toppers. Deposition  of April Thomas ("Thomas Dep."), attached as **EXHIBIT G**, p. 10:1-8.

22.   As a house mom, SG serves as "the direct supervisor of the day-to-day activities of the girls" and makes the entertainers schedules. 30(b)(6) Dep., p. 37:4-19; D.E. 25, ¶ 34 ("Defendants admit that Defendants DLG and SG have responsibility for supervision of performers at Toppers…").

23.   As a house mom, SG makes decisions on whether entertainers will be fined for breaking one or more of Toppers' many rules.  *See* 30(b)(6) Dep*.,* p.

87:16-21; Thomas Dep., p. 13:19-24; SG Dep., p. 20:1-9.

### C.   TOPPERS' MANAGEMENT AND ORGANIZATION

24.   At all times since December 2012 ("class period"), the management team at Toppers has included the owner (Defendant Darnell Lewis Gardner) and various "house moms" who Toppers acknowledges directly supervise the entertainers on a day-to-day basis.  30(b)(6) Dep., p. 37:4-19; Burrell Dep., pp. 13-18 ("they were dancer managers").  There is also a security person, Sean Behr, who serves in a management capacity.  30(b)(6), p. 50:9-23.

25.   Besides entertainers and house moms, Toppers employs security staff, bartenders and a door girl, who it likewise classifies as independent contractors, all of whom get paid solely through mandatory tip outs from the entertainers.  *See* 30(b)(6) Dep., pp. 50-53, 57, 129:9-130:10, 135:3-5; Thomas Dep., p. 16:19-21; SG Dep., p. 36:3-5.

26.   Toppers also hires disc jockeys ("DJs") to play music at the club.  DJ's are classified as independent contractors by Toppers. See Interrogatory Responses, ¶ 2.

27.   Toppers management, including DLG, and the house moms have the authority to ask entertainers to leave the premises for violations of club policies.  *See* 30(b)(6) Dep., pp. 82:16-83:3; SG Dep., pp. 15:23-16:8, 16:23-17:7.

28. Toppers management has the authority to terminate entertainers for violations of club policies or at their discretion.  30(b)(6) Dep., pp. 48:6-20; 45:7-9, 82:16-83:3; Thomas Dep., p. 10:1-8; *see also* "Independent Contract Re-Instatement Fees" Form, attached as **EXHIBIT H**; SG Dep. 14:19-22.

29. Managers have the authority to settle disputes between customers and entertainers. *See* 30(b)(6), p. 50:15-18.

30. The "house mom" has authority to reprimand entertainers for violations of house rules. *See* 30(b)(6), pp. 87:16-88:14; SG Dep., pp. 15:19-16:8.

31. Repeated violations of house rules may lead to an entertainer being banned from dancing at Toppers. 30(b)(6) Dep., pp. 48:6-20; 82:16-83:3; Thomas Dep., p. 10:1-8.

32. Toppers management imposed fines on entertainers if they broke any laws or violate any of Toppers extensive list of rules.  30(b)(6) Dep., pp. 82-87, 125; *see also* Independent Contract Re-Instatement Fees; Thomas Dep., p. 13:7-24; Burrell Dep., p. 24:14-20; SG Dep., pp. 15:19-16:8, 16:23-17:6.

33. Fines were continually implemented and enforced at Toppers. *See* Dancer Check-in Sheets attached as **EXHIBIT I**; *see also* Burrell Dep., p. 24:14-20; SG Dep., pp. 20:12-21:9; Independent Contract Re-instatement Fees.

34. Day-to-day managerial decisions at Toppers are made by house moms or

escalated to DLG.  30(b)(6) Dep., pp. 37:4-19, 50:9-23; Burrell Dep., pp. 13-18; SG Dep., pp. 13:23-14:4, 14:19-22, 21:5-21.

### D.   HOUSE MOMS AND DISC JOCKEYS AT TOPPERS

35.   House moms, who supervise the entertainers, are compensated entirely through tip out from entertainers, in the form of a mandatory "house fee" charged at the beginning of each shift and a mandatory tip out at the end of each shift.   Further, house moms receive a portion of all fines levied against entertainers from violation of the house rules.  30(b)(6) Dep., pp. 37:4-19 (house moms are "the direct supervisor of the girls"), 43:13-18, 50:9-23, 52:19-23, 53:9-20, 57:4-25, 85:8-14; Burrell Dep., pp. 13-18; Thomas Dep., p. 16:19-21.

36.   House moms work directly with the entertainers and are responsible for hiring and firing entertainers, ensuring entertainers meet appearance standards, delivering reprimands and fines, and resolving disputes between dancers. 30(b)(6) Dep., pp. 37:4-19, 43:13-18, 45:16-24, 47:7-11, 50:9-23, 52:19-23, 53:9-20, 59:12-17; Burrell Dep., pp. 13-18, 25:19-21, 26:17-21; SG Dep., pp. 13:23-14:4, 14:19-22, 16:3-8, 20:2-11, 20:21-21:9.

37.   There are also disc jockeys ("DJs") that work at Toppers. The DJs receive 25% of the house fees collected from the entertainers at the beginning of each shift and each dancer is also required to tip out the DJ at the end of

each shift either $10 or 10% of their tips earned, whichever is greater. 30(b)(6) Dep., pp. 57:19-25, 59:8-11.

## II.   DEFENDANTS' MISCLASSIFICATION OF ENTERTAINERS.

### A.   METHODS OF CONTROL AND SCHEDULING

38.   Toppers management schedules the days and times of each shift that entertainers are scheduled to work.   30(b)(6) Dep., pp. 55:1-12, 92:18-24 (house moms create the schedule that dictates when each entertainer had to be at the club to work); Burrell Dep.,  pp. 18:22-24, 19:5-9.

39.   Entertainers are required to work a minimum of four (4) nights per week. *See* 30(b)(6) Dep., pp. 55:13-56:3, 77:15-78:7; *see also* Dancer General Information, p. 1.  To the extent an entertainer is permitted to work three (3) rather than the required four (4) nights per week, she is still required to pay Toppers house fees for the fourth night, even though she does not work that night. *Id.*

40.   Toppers also requires that each entertainer work at least one of the slower nights—Monday, Tuesday or Wednesday—each week in order to work the preferred weekend shifts.  If an entertainer fails to work at least one of the slower nights Toppers does not allow the entertainer to work the weekend shifts. *Id*., p. 56:9-23; Burrell Dep., p. 19:13-16; Thomas Dep., p. 17:1-9; RFA Responses, ¶ 9; Dancer General Information.

41.    Toppers also requires entertainers to work the Friday before a University of
Georgia football game day Saturday in order to work on game day.  *See*
Burrell Dep., p. 19:8-9.

42.    Entertainers are subject to fines for arriving after the start time for a    shift
or leaving early at the end of a shift without notifying management.  *See*
30(b)(6) Dep., p. 125:3-5; *see also* Independent Contract Re-instatement
Fee's, #18;  Dancer General Information, p. 2.

43.    Entertainers who are unable to work a scheduled shift and fail to notify
Toppers' house mom are fined $200.00.  *See* Dancer General    Information,
p. 2.  Moreover, even when entertainers notify the house mom that    they
are unable to work and the reason why, they are still subject to fines    of
$200 per missed shift.  *See* Thomas Dep., pp. 13:21-14:2 (fined $200 twice
even though she called out sick).

44.    Toppers requires that any call an entertainer makes to a house mom
concerning her inability to work a scheduled shift be made between 4 and
5pm.  *See* Dancer General Information, p. 2.

        1.    HOUSE FEES.

45.    When an entertainer arrives for her shift at Toppers, she is required to sign
in, and pay house fees.  *See* 30(b)(6), pp. 54:20-25, 123:3-8; Thomas Dep.,
p. 15:8-11 ("We were not allowed to work unless we paid that tip-out, to

work.  We would not be able to work at all, period. They would send us home, because we would have to pay immediately when we walked in the door."); RFA Responses, ¶¶ 22, 23; Dancer General Information ("If you are unable to pay your house fee then you are not allowed to work."); D.E. 25, ¶ 23.

46.   The house fee schedule was established by DLG and has been the same since  at least 2012.  30(b)(6) Dep., p. 58:6-9 and 21-23.

47.   The current house fee schedule is as follows:

   7:00pm arrival: $20

   8:00pm arrival: $30

   9:00pm arrival: $40

   10:00pm arrival: $50

*See* 30(b)(6) Dep., p. 55; RFA Responses, ¶ 24; Dancer General Information, p. 2; D.E. 25, ¶ 23.

48.   The house fees that entertainers pay are used to pay Toppers' other employees,  including the house moms, bartenders, door girls, security staff and DJs.   *See* 30(b)(6), pp. 57:22-25, 129:9-130:10; SG Dep., pp. 23:25-24:8, 24:23-25:1.

49.   Every entertainer has been required to pay house fees for each shift they worked at Toppers. *See* 30(b)(6), pp. 54:20-25, 123:3-8; Thomas Dep., p.

15:8-11; RFA Responses, ¶ 23.

50. Entertainers are required to pay house fees for a minimum of four (4) shifts per week, even to the extent that they work fewer than four (4) shifts for any reason. *See* Dancer General Information.

### 2. DRESS AND APPEARANCE

51. Toppers management restricted what entertainers are allowed to wear when performing at Toppers, and the house moms had the authority (and did) tell entertainers that certain outfits were not suitable. *See* Burrell Dep., p. 23:9-20; SG Dep., pp. 13:23-14:4, 26:13-21; D.E. 25, ¶ 21.

52. The house mom checks the entertainers' hair and nails prior to their entrance from the dressing room to the main club floor. Burrell Dep., pp. 23:21-23; 26:13-21; *see also* SG Dep., pp. 11:4-5, 13:23-14:4; *see also* Dancer General Information.

### 3. STAGE ROTATION

53. There is a single long stage at Toppers. *See* Declaration of Christie Burrell ("Burrell Dec."), attached as **EXHIBIT J**, ¶ 6.

54. The rotation (i.e., the order in which entertainers dance on stage) is determined by the order in which entertainers signed in with the DJ when arriving, and the DJ typically calls the entertainers to the stage in this order. *Id.*, ¶ 7.

55.  An entertainer is required to go to the stage when her name is called by the DJ, even if she is entertaining in the VIP room.  If she fails to appear, security, the house mom, or a manager will resolve the issue as to why she failed to appear on stage when called.  An entertainer is subject to fines if she fails to appear on stage when called.  *Id.*, ¶ 10; *see also* Dancer General Information, p. 3; *see also* Independent Contract Re-instatement Fees, p. 1 ($10 missing stage call; $20 missing stage call for 2nd time; $40 missing stage  call 3rd time).

56.  Once called to the stage for their "stage set," the entertainers are required to dance for 3 songs.  Dancer General Information, p. 3.

57.  Toppers' written policies and rules dictate the timing and manner in which an entertainer must disrobe and requires that by the second song of the stage set the entertainer be topless.  Likewise, Toppers' written policies and rules dictate that by the third song of the stage set the entertainer must be "down to your G-string."  *Id*.

58.  Entertainers are required to complete each three song set, and may not exit the stage—even upon completion of the three songs—until the next entertainer takes the stage for her stage set and relieves the entertainer.  *Id*.

59.  When dancing on the stage, entertainers receive cash tips from customers.  These tips are split among the entertainers sharing the stage at that time.

Burrell Dec., ¶ 12.

### 4. POST-SHIFT REQUIREMENTS AND MANDATORY FEES

60.    In addition to the house fees, Toppers also requires that entertainers tip out the house moms, security and DJs at the conclusion of their shifts, prior to leaving. *See* 30(b)(6) Dep., pp. 58:24-59:7; Thomas Dep., p. 16:19-21.

61.    At the conclusion of every shift, all entertainers are required to tip out the DJs a minimum of $10 or 10% of their tips, whichever is greater. *See* 30(b)(6) Dep., p. 59:8-11; Dancer General Information, p. 2.

62.    At the conclusion of every shift, all entertainers are required to tip out $5 to the house moms. *See* 30(b)(6) Dep., p. 59:12-17; Dancer General Information, p. 3.

63.    At the conclusion of every shift, all entertainers are required to tip out $10 to the security staff. *See* 30(b)(6) Dep., p. 60:10-18; Dancer General Information, p. 2.

### 5. ADDITIONAL RULES

64.    Toppers has a multitude of written lists of rules, policies and procedures which govern the entertainers' employment. *See* 30(b)(6) Dep., pp. 77:12-78:21; 81:16-83:3; Dancer General Information, p. 3 ("Both feet should be on the floor at all times." and p. 4 ("Must remove shoes for the dance, no exceptions!"), and p. 5. ("When a customer asks you if you would like a

drink! Always says YES!!!"); Independent Contract Re-Instatement Fees, generally.

65. Management has discretion to enforce these rules as they see fit. 30(b)(6) Dep., pp. 84:2-11, 87:3-24; SG Dep., pp. 20:21-21:21.  A lot of the rules are a "scare tactic" and the fines are never instituted.  Toppers creates the rules and the accompanying fines so that they can control the way the entertainers behave.  *See* 30(b)(6) Dep., p. 86:45-19.

66. Upon passing an audition and prior to being hired by Toppers, entertainers are given a copy of these policies and procedures and required to sign their assent to this document. *See* 30(b)(6) Dep., pp. 77:12-78:21; 81:16-83:3; Thomas Dep., p. 11:7-15; Burrell Dep., pp. 10:7-11:18; RFA Responses, ¶ 39.

67. Entertainers are also required to agree that they are being classified as independent contractors. If they fail to sign this document, they are not allowed to work at Toppers as entertainers. *See* 30(b)(6) Dep., pp. 23:10-25, 28:21-23.

## 6. DISCIPLINE

68. If an entertainer violates one of the policies, a manager may verbally reprimand her. For more serious violations an entertainer may be terminated. 30(b)(6) Dep., pp. 48:6-16, 49:12-16; SG Dep., pp. 20:19-

21:21; Burrell Dep., pp. 24:14-20, 25:3-7.

69.   In addition to the fees discussed above, management fined entertainers for other alleged violations. *See* 30(b)(6) Dep., pp. 77:12-78:21; 81:16-83:3; Dancer General Information; Independent Contract Re-Instatement Fees; Burrell Dep., p. 24:14-20; RFA Responses, ¶ 31.

### B.   ENTERTAINERS HAVE NO OPPORTUNITY FOR PROFIT/LOSS

70.   Entertainers do not advertise or market their services.  Rather Toppers is exclusively responsible for all advertising and marketing.  *See* 30(b)(6), p. 63:4-25; Burrell Dep., p. 22:9-17; RFA Responses, ¶¶ 13-14; *see also* Dancer General Information, p. 5 (*Make sure you always try to make money for the BAR!!!").        .

71.   Entertainers earn money solely through tips from Toppers' customers for dances they perform and Toppers sets the prices for the dances that the entertainers perform. *See* 30(b)(6) Dep. at pp. 89:12-21, 91:10-13, 103:22-104:25, 106:7-11; *see also* Dancer General Information, pp. 3-4; Response to Interrogatories, ¶ 14; RFA Responses, ¶ 36; Burrell Dep., p. 14:8-14.

### C.   RELATIVE INVESTMENT AND CONTROL OF THE BUSINESS

72.   Defendant DLG owns Toppers. 30(b)(6) Dep., pp. 42-43, 71.

73.   Toppers employs bartenders, security, DJs, management, and a door girl. *See*

30(b)(6) Dep., pp. 50-53, 57, 129:9-130:10, 135:3-5; Thomas Dep., p. 16:19-21; SG Dep., p. 36:3-5; Interrogatory Responses, ¶ 2.

74.    Toppers, not the entertainers provide the facility, stage, and poles on which the entertainers dance at the club. Toppers currently pays roughly $120,000 per year in rent for the facility that houses Toppers, and the annual rent for the facility has been over $100,000 throughout the class period. *See* 30(b)(6) Dep., pp. 61:11-62; RFA Responses, ¶¶ 15, 16.

75.    Toppers, not the entertainers pay the utility bills on behalf of Toppers.  RFA Responses, ¶¶ 17, 18.

76.    Toppers, not the entertainers are responsible for obtaining and paying for liability insurance. *Id*., ¶¶ 19. 20.

77.    Each entertainer's "investment" is limited to her own apparel and makeup.  30(b)(6) Dep., p. 64:10-16; RFA Responses, ¶ 21 ("Plaintiff did not make any investments in the enterprise").

   **D.    ENTERTAINERS JOBS REQUIRE ALMOST NO SKILL OR SPECIALIZATION**

78.    Past experience in adult dancing is not a pre-requisite in order to work at Toppers.  *See* Burrell Dep., p. 11:19-20 (no prior experience); Thomas Dep., p. 11:7-15 (same).

79.    There is no requirement that entertainers have formal training in order to

work  at Toppers.  *Id.; see also* D.E. 25, ¶ 20 (Defendants provided training).

80.  When an individual wants to work as an entertainer at Toppers, she comes to the club and is directed to audition. *Id.*; SG Dep., p. 10:2-10; 30(b)(6) Dep., pp. 45:16-46:3, 46:16-17.

81.  The audition is held by the house mom on duty that day.  *Id.*

82.  If an entertainer seeking employment is attractive enough, Toppers waives the audition altogether. 30(b)(6) Dep., p. 90:14-18.

### E.   PERMANENCY OF RELATIONSHIP

83.  Entertainers typically work for Toppers for at least a year or longer.  *See* Burrell Dec., ¶ 2 (3.5 years); Thomas Dep., pp. 8:8-20, 11:21-22 (7 years).

84.  Named Plaintiff Christie Burrell worked as an entertainer at Toppers from approximately February 2012 through November 2015. Burrell Dec., ¶ 2.

85.  Opt-in Plaintiff April Thomas worked as an entertainer at Toppers from 2008  to 2015.  Thomas Dep., pp. 8:8-20, 11:21-22.

### F.   ENTERTAINERS ARE INTEGRAL TO TOPPERS' BUSINESS

86.  Entertainers are integral to the operation of Toppers. Burrell Dec., ¶¶ 13-14; 30(b)(6) Dep., p. 98:15-17 ("We're not a big club… So every girl that we have is important.").

87.  Toppers has a long stage that is prominently featured in the club.  Burrell Dec., ¶ 6.

88.   If no entertainer shows up for a shift, Toppers cannot operate its business as a strip club.  *Id.,* ¶ 14; 30(b)(6) Dep., pp. 98:23-99:1 ("because we don't have a lot of girls, they don't try to overload the schedule like a bunch of girls on Wednesday and no girls on Saturday.").

III.   **DEFENDANTS' OFFSET THEORY FAILS BECAUSE ENTERTAINERS RECEIVED ONLY TIPS, WHICH WERE GIVEN DIRECTLY BY CUSTOMERS TO ENTERTAINERS AND NOT RECORDED IN DEFENDANTS' GROSS RECEIPTS**

89.   Toppers does not pay entertainers wages or include them in payroll. *See* Response to Interrogatories, ¶ 14; RFA Responses, ¶¶ 6, 36; *see also* 30(b)(6) Dep., p. 89:12-21; Burrell Dep., p. 14:8-14; Thomas Dep., p. 12:12-13.

90.   Entertainers' sole source of income for their work at Toppers is money given to them by Toppers customers in the form of tips.  *Id.*; RFA Responses, ¶¶ 6, 7, 32 ("sole source of income as an exotic dancer pursuant to the independent contractor arrangement comprised tips from patrons").

91.   While the minimum tips for a table dance, lap dance and private dances in the executive room are set by Toppers, entertainers were free to ask for more. *See*   D.E. 25, ¶ 22 ("Defendant DLG established prices for certain performances with Plaintiff and other performers being able to accept tips in excess of those prices."); 30(b)(6) Dep. at pp. 91:10-13, 103:22-104:25,

104:12-25 ("That's the minimum. Some girls charge more; some girls charge less."), 106:7:11; *see also* Dancer General Information, pp. 3-4.

92.   When customers pay entertainers, they pay the entertainer directly in cash or in "Toppers' Dollars," which the entertainers can then exchange for cash. *See* RFA Responses, ¶ 7.

93.   With the exception of amounts received for executive room dances/time, Toppers does not record any amounts entertainers receive or how much they tip out.  As such, Toppers is unable to and does not record amounts received by entertainers in its gross receipts.  *See* 30(b)(6) Dep., pp. 135:6-8, 136:4-5 ("we have no idea what the girls make").

94.   In fact, the club recognizes that it cannot under any circumstances touch the entertainers' money.  SG Dep.*,* p. 35:2-9.

95.   Nothing in the contracts Defendants required Plaintiffs to sign states that money from customers shall belong to Toppers should entertainers be found to be employees.   *See* Dancer and Independent Contractors Agreement, attached as **EXHIBIT K**, generally; 30(b)(6) Dep., p. 100:6-22.

96.   No one at Toppers tracks the number of dances entertainers perform or the amount of tips they receive from customers.  *See* 30(b)(6) Dep., p. 136:4-5 ("we have no idea what the girls make").

## IV.   TOPPERS' FLSA VIOLATIONS WERE COMMITTED IN RECKLESS DISREGARD TO ITS OBLIGATIONS UNDER THE FLSA

97.   Since 1993, Toppers has operated under the same model at issue in this case and has never investigated or sought an opinion from any source regarding the legality of its treatment of entertainers as independent contractors. *See* 30(b)(6) Dep., pp. 11:9-13:18.

98.   Toppers has long recognized that its classification of its entertainers as independent contractors is potentially an issue. *Id*.

99.   However, save for an alleged conversation with a U.S. Department of Labor field agent in 1993, Toppers has never investigated whether its treatment of its entertainers as independent contractors complied with the FLSA. *Id*.

100.   Furthermore, even with respect to that alleged conversation, Toppers never received an opinion from the Department of Labor ("DOL"), regarding whether its classification of its entertainers as independent contractors was legal. *Id*., p. 11:3-15.

101.   Toppers acknowledges that as a result of that conversation with DOL and conversations with its accountant, John Padgett, all of which occurred in 1993, it has always been aware that in order to treat a worker as an independent contractor, "[t]hat number one, you couldn't touch their money;

and number two, you couldn't tell them what to do." In other words, Toppers has always known that "we couldn't charge them…we couldn't take their money… we couldn't say… you pay him 100 bucks." SG Dep., pp. 29:24-30:14, 32:10-17, 33:5-12.

102. Toppers has *always* understood, since at least 1993, that it was improper to set a minimum amount of money that the entertainers have to pay or any amount of money that someone has to pay someone else if they are treated as an independent contractor. *Id.,* p. 35:2-9.

103. Likewise, Toppers has *always* understood, since at least 1993, that it cannot require people it classifies as independent contractors to work a minimum of four (4) days per week. *Id*., p. 38:12-25.

104. Notwithstanding the knowledge that it was improper to set a minimum amount of money that entertainers have to pay or any amount of money that entertainers had to pay anyone else, it has always required entertainers to pay house fees at the beginning of each shift and tip out house moms, DJs and security at the end of each shift. *Id*., pp. 35:5-36:5; 30(b)(6) Dep., pp. 54:20-25, 123:3-8; Thomas Dep., p. 15:8-11 ("We were not allowed to work unless we paid that tip-out, to work. We would not be able to work at all, period. They would send us home, because we would have to pay immediately when we walked in the door."); RFA Responses, ¶¶ 22, 23;

Dancer General Information ("If you are unable to pay your house fee than you are not  allowed to work.").

105.   Notwithstanding its knowledge that it was illegal to treat entertainers as independent contractors while requiring them to work a minimum of four (4) nights a week, since at least 1993, Toppers has required its entertainers to work a minimum of four (4) nights per week throughout the class period. SG Dep., p. 38:12-25; 30(b)(6) Dep., pp. 55:13-56:3, 77:15-78:7; *see also* Dancer General Information, p. 1.

106.   Toppers has maintained a monthly subscription to "Exotic Dancer" magazine since 1992 or 1993, when it first opened. 30(b)(6) Dep., pp. 17:20-18:6, 18:23-25.

107.   Exotic Dancer magazine is a trade magazine for the adult nightclub business and each issue has a section regarding law and regulations pertaining to the industry. *See id.,* 17:20-22, 18:12-16.

108.   Among the legal issues covered by Exotic Dancer magazine is the misclassification of entertainers as independent contractors that is rampant throughout the adult/exotic nightclub business. *See, e.g.,* Brad Shafer, *Who holds the cards if your club gets hit with a dancer class-action lawsuit?*, EXOTIC DANCER, at 18 (attached as **EXHIBIT L**).

109.   Defendants acknowledge that during the pendency of this lawsuit they have

become aware that many adult clubs have been sued over the very same issues they are being sued over in this case.  Nonetheless they have done no further investigation regarding their potential liability under the FLSA, and with the exception of requiring their entertainers to waive their right to sue in court and elect whether they wish to be taxed as 1099 contractors or W-2 employees they have made no changes to the way they operate.  30(b)(6) Dep., pp. 33:7-25, 34:22-25, 139:15-140:16, 141:1-10.

Respectfully submitted this 8th day of March, 2017.

/s/ Andrew R. Frisch
ANDREW R. FRISCH
Georgia Bar No. 366105
Morgan & Morgan, P.A.
600 N. Pine Island Road, Suite 400
Plantation, FL 33324
T: (954) WORKERS;  Fax: (954) 327-3013
Email: afrisch@forthepeople.com

**Counsel for Plaintiff**


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been sent via U.S. Mail and electronic mail to all counsel listed above, this 8th day of March, 2017.

/s/ Andrew R. Frisch
Andrew R. Frisch

24