# EXHIBIT A

1                    UNITED STATES DISTRICT COURT
2                    MIDDLE DISTRICT OF GEORGIA

3                         ATHENS DIVISION

4
                 CIVIL ACTION NO.: 3:15-cv-0012-CDL
5

6
    CHRISTIE BURRELL, individually, and on
7   behalf of all others similarly situated,

8

9              Plaintiff,

10   -vs-

11
    TOPPERS INTERNATIONAL, INC., a
12   Domestic Profit Corporation, DARNELL
    LEWIS GARDNER, individually, and
13   SANDRA GARDNER, individually,

14              Defendants.
    _____
15

16

17              DEPOSITION OF DARNELL GARDNER

18
                 Monday, January 30, 2017
19                    10:27 - 3:23 p.m.

20

21

22              191 Peachtree Street Northeast
                       Suite 4200
23              Atlanta, Georgia 30303

24

25

1   Reported By:
    Cynthia Hopkins, RPR, CCR
2   Notary Public, State of Georgia
    U.S. Legal Support
3   Job #1520881

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Darnell Gardner
January 30, 2017                                    3

1    APPEARANCES:

2    On behalf of the Plaintiff:

3         ANDREW R. FRISCH, ESQUIRE
          MORGAN AND MORGAN, P.A.
4         600 North Pine Island Road
          Suite 400
5         Plantation, Florida  33324
          Phone:  954.327.3013
6

7

8    On behalf of the Defendants:

9         JOHN JAY MCARTHUR, ESQUIRE
          McARTHUR, McARTHUR & OVEREND, LLP
10        269 North Jackson Street
          Athens, Georgia  30603
11        Phone: 706.353.7736

12

13

14

15   ALSO PRESENT:

16        SANDRA GARDNER

17

18

19

20

21

22

23

24

25

Darnell Gardner
January 30, 2017                              5

```
 1              P R O C E E D I N G S

 2                    -  -  -

 3       Deposition taken before Cynthia Hopkins,

 4   Registered Professional Reporter, and Notary Public

 5   in and for the State of Georgia at Large, in the

 6   above cause.

 7                         -   -   -

 8   Thereupon,

 9                    (DARNELL GARDNER)

10          Having been first duly sworn or affirmed, was

11   examined and testified as follows:

12          THE WITNESS:  I do.

13                   DIRECT EXAMINATION

14   BY MR. FRISCH:

15       Q    Good morning, Mr. Gardner.  My name is Andrew

16   Frisch.  I represent the Plaintiff in this case I

17   brought to the FSLA against Toppers, you individually,

18   Darnell Gardner and Sandra Gardner, individually, and as

19   well who I understand is your mother; is that right?

20       A    Yes.

21       Q    I am going to ask you questions today both in

22   the context of the 30(b)6 as the corporate

23   representative as well as in your individual capacity.

24          A few rules for today that will make the

25   deposition hopefully go a little smoother and ensure
```

1   and told them our setup, and they didn't have a problem

2   with it.  That's pretty much the standard setup for

3   every bar in Athens.

4        Q    Who did you speak to in Athens?

5        A    I don't remember.  It was so long ago.

6        Q    When was it?

7        A    We -- actually when we opened Toppers in 1992,

8   we talked to them about that setup in 1993.  And he

9   didn't have a problem with it, and we never revisited it

10  again since then.

11       Q    Tell me about that conversation.  Was it over

12  the phone or in person?

13       A    In person.

14       Q    Who was there?

15       A    Me, him, and Sandra.

16       Q    Where was it?  Where did the conversation

17  happen?

18       A    In the Department of Labor.

19       Q    You went -- did you make an appointment?  How

20  did you get there?

21       A    We made an appointment.

22       Q    Do you remember what the position that that

23  person held was?

24       A    I think it was just a field agent.

25       Q    What was the purpose of making this

Darnell Gardner
January 30, 2017                                    11

1    appointment to meet with the field agent?

2        A    Because we were opening Toppers at that time

3    and we wanted to know what our parameters were.

4        Q    Do you have any record of the meeting?

5        A    No.

6        Q    Do you have anything in writing regarding

7    their opinion?

8        A    No.

9        Q    Did you ever update that opinion?

10       A    No.

11       Q    Did you ever speak to an attorney at any point

12   prior to the initiation of this lawsuit regarding

13   whether or not it was appropriate to classify people who

14   had been contractors in various positions at Toppers?

15       A    No.

16       Q    Other than this one conversation that you

17   think is in or about 1992 or 1993 with regard to Toppers

18   when you were opening, did you have any conversation

19   with the Department of Labor regarding your other

20   business about the propriety of or the appropriateness

21   of classifying certain employees as independent

22   contractors?

23       A    No.

24       Q    Did you ever speak to, at any point prior to

25   the initiation of this lawsuit, an accountant or any

Darnell Gardner
January 30, 2017                                        12

1    other professional regarding the propriety of

2    classifying certain people as independent contractors at

3    Toppers?

4         A    No.

5         Q    Tell me the sum and substance as best you

6    remember the 1992 or 1993 appointment with the

7    Department of Labor field agent that you claim to have

8    had.  What did you say to them and what did they say to

9    you as best you can recall?

10        A    We basically went and told him that we were

11   opening a dance club, a gentlemen's club, and that the

12   way we were situating how we were going to pay people is

13   the girls were to come in.  They would tip when they

14   came in the door which is called a house fee.  And we

15   would take the house fee, set it aside.  And then at the

16   end of the night, we would take what the girls tipped in

17   house fees and pay their support staff which would be

18   security, DJ's, bartenders.

19        Q    And you're claiming you told the field agent?

20        A    We explained it to him.

21        Q    And what did he say to you?

22        A    He said, okay, he would do some investigation

23   into seeing whether that was appropriate or not, and

24   then we never heard back from him.

25        Q    Okay.  So you never got an opinion one way or

Darnell Gardner
January 30, 2017                                    13

```
 1    another?
 2         A    Never got an opinion one way or another.
 3         Q    But you knew there was potentially an issue
 4    which is why you went to speak with them in the first
 5    place.  You were trying to figure out whether there was
 6    an issue or not?
 7         A    Correct.
 8         Q    But you never found -- you never got a
 9    resolution to find out whether it was legal or not
10    legal?
11         A    No.
12         Q    After that meeting, any effort you undertook
13    from any source whether or not it was legal or illegal
14    to do that?
15         A    No.
16         Q    What follow-up did you do, if any, with regard
17    to the field agent regarding this meeting?
18         A    None.
19         Q    None.  And you didn't do any follow-up with
20    anyone else either?
21         A    No.
22         Q    When I say any follow-up about any issues that
23    we talked about, so classifying independent contractors,
24    specifically the entertainers, you didn't follow up with
25    anyone in 1993 with this one appointment?
```

Darnell Gardner
January 30, 2017                                        17

1        A     Never joined.

2        Q     Ever go to a convention or speak to any --

3        A     I am sorry.  I didn't mean to -- I went to a

4   convention in '96, '97.

5        Q     Where was that convention?

6        A     Las Vegas.

7        Q     What was that convention?

8        A     Gentlemen's club.

9        Q     And what went on or was there an itinerary at

10  that convention?

11       A     Yes.

12       Q     Do you remember any of the events of the

13  itinerary?

14       A     Bar supplies, feature dancers, entertainer of

15  the year, club of the year.

16       Q     Anything else that you can recall?

17       A     No.  That's the only thing I went to.

18       Q     Are those the only events that you attended?

19       A     Yes.

20       Q     Did you get any kind of magazines or trade

21  papers regarding the exotic nightclub industry?

22       A     Exotic Dancer.

23       Q     It's -- okay.  Is this it, a trade paper?

24       A     Yes.

25       Q     For how long have you been getting that?

Darnell Gardner
January 30, 2017                                    18

```
 1          A     Since we've been open.

 2          Q     Is that a subscription newspaper or magazine?

 3          A     Once you're on the grid, they send it out to

 4    you.

 5          Q     How frequently do they send it?

 6          A     Once a month.

 7          Q     Is it a magazine or a newspaper?

 8          A     It's a magazine.

 9          Q     What types of things are covered in the

10    monthly issues?

11          A     Music, clubs for sale, feature dancers.

12          Q     How about law and regulations, is that

13    something that you talked about?

14          A     There is a section in there.

15          Q     Regulatory and compliance or legal compliance?

16          A     Yes.

17          Q     Do you know where Exotic Dancer is published?

18          A     No, I don't.

19          Q     Or where they are based?

20          A     No.

21          Q     It's called Exotic Dancer magazine?

22          A     Yes.

23          Q     You have been getting it every month as far as

24    you can recall from 1993?

25          A     Yes.
```

Darnell Gardner
January 30, 2017                    21

```
 1    if you're making changes to the rules at the club?
 2         A    If I make changes to the rules?
 3         Q    Yeah.
 4         A    No one.
 5         Q    You just do it yourself without -- do you
 6    speak to your mother?
 7         A    Yes, I will tell her what I did.  I don't
 8    consult with her.
 9         Q    How did you prep for today's deposition?
10         A    How did I prepare?
11         Q    Yep.
12         A    I didn't.
13         Q    Did you speak to anyone?
14         A    Mr. McArthur.
15         Q    I don't want to know what you spoke to him
16    about.  How long did you speak with him for in
17    preparation for the deposition?
18         A    Twenty minutes.
19         Q    When was that?
20         A    On the drive down here.  I drove down last
21    night, so I talked to him on the telephone on my drive
22    down here.
23         Q    Did you speak to anyone else in preparation
24    for today's deposition?
25         A    No.
```

Darnell Gardner
January 30, 2017                                    22

1      Q    Did you speak to your mom in preparation for

2  today's deposition?

3      A    I told her what time that I was supposed to be

4  here today.  Other than that, no.

5      Q    Did you review any documents in order to

6  prepare for today's deposition?

7      A    For today's deposition?

8      Q    Yes.

9      A    I gave him documents about a week ago maybe.

10     Q    When you say "him," you're talking about your

11 lawyer?

12     A    I gave my attorney, John McArthur, documents

13 about a week ago that he said we might need for the

14 deposition.

15     Q    All right.  And who was responsible for

16 searching for those documents on behalf of the

17 Defendants?

18     A    I was.

19     Q    Did anyone else help you?

20     A    No.

21     Q    What documents did you produce to your

22 attorney?

23     A    Last three years tax returns for me and the

24 club, our executive room sign-in sheets.  That applies

25 to this deposition, right?  Because I gave him a ton of

```
 1   other documents but I think that was for the lawsuit,
 2   not for the deposition.
 3        Q    What other documents did you search for or
 4   find that you believe were responsive to the requests
 5   that were made by the Plaintiffs in this lawsuit?
 6        A    Door sign-in sheets, and the contract for the
 7   Plaintiffs.
 8        Q    Independent contract agreements?
 9        A    Yes.
10        Q    Were you able to find an independent contract
11   agreement executed by each one of the Plaintiffs?
12        A    Yes.
13        Q    You were?
14        A    Uh-huh.
15        Q    Does Toppers or did the Defendants require all
16   the entertainers who dance at Toppers to sign an
17   identical independent contract?
18        A    Yes.
19        Q    For how long has it been the same contract
20   that everyone has to sign?
21        A    It was the same contract that they signed up
22   until 2016.
23        Q    So from 1993 until 2016, it was always the
24   same contract?
25        A    Yes.
```

Darnell Gardner
January 30, 2017                                    24

1        Q     At some point in 2016 that contract was

2   changed?

3        A     Yes.

4        Q     In what respect was it changed?

5        A     We changed the contract to state that we give

6   them an option to be an independent contractor or an

7   employee.

8        Q     And who drafted the new contract?

9        A     I did.

10        Q     What, if any, people or sources of information

11   did you consult in drafting the new contract?

12        A     I got a copy of a contract from the Pink Pony

13   that they redrafted their contract in 2016.

14        Q     You basically copied it?

15        A     Excuse me?

16        Q     You basically copied it, or you used it as the

17   basis of yours?

18        A     Yes, I used it as a basis of mine.

19        Q     Did you speak to the Department of Labor in

20   the context of redrafting the contract?

21        A     No.

22        Q     Did you speak to an attorney in the context --

23        A     My attorney.

24        Q     Is that Mr. McArthur?

25        A     John McArthur.

Darnell Gardner
January 30, 2017                                25

```
 1        Q    When you redrafted the contract in 2016 how,
 2   if at all, did the duties of the entertainers change
 3   from those that entertainers had performed at the club
 4   prior to 2016?
 5        A    They basically stayed the same.
 6        Q    For those people -- assuming that there were
 7   one or more entertainers who elected in 2016 to be
 8   treated as employees rather than independent
 9   contractors, in what ways, if at all, did their duties
10   vary from those that were deemed or who selected to be
11   an independent contractor?
12        A    The only thing that changed was the tip
13   allotment.  If they elected to be employees, they would
14   get paid the tipped employee wage.  And then when they
15   conducted VIP's or table dances, they would get a
16   percentage instead of all.
17        Q    But the duty -- I'm talking about how they get
18   paid.
19        A    Correct.
20        Q    Is that the only difference between how the
21   club currently treats -- when I am saying "club" I'm
22   talking about Toppers, obviously, the Defendants
23   together.
24        A    Right.
25        Q    So the only difference between how employees,
```

1    entertainer at Toppers was required to sign a new

2    contract; is that right?

3         A    Yes.

4         Q    And is it also correct that the new contract

5    that all entertainers were required to sign in or about

6    February 2016 contained an arbitration clause?

7         A    Yes.

8         Q    Do you know and were people permitted to

9    continue dancing or working as entertainers at Toppers

10   if they refused to sign this new contract in

11   February 2016?

12        A    There weren't nobody refused to sign.

13        Q    But they were required to sign it to continue

14   employ -- I'm sorry to continue their employment?

15        A    They were required to sign a contract to

16   either be classified as an independent contractor or

17   classified as an employee.  You had to sign one way or

18   the other.

19        Q    So they had to -- I guess --

20        A    Yes.

21        Q    They had to sign the contract in order to

22   continue performing as entertainers at Toppers, right?

23        A    Yes.

24        Q    And do you know when the notice went out to

25   entertainers eligible to join this collective action?

Darnell Gardner
January 30, 2017                                    33

```
 1    contractor; is that what you are saying?
 2         A    Yes.
 3         Q    Did you tell anyone -- did you discuss the
 4    effect the arbitration clause would have on people's
 5    ability to participate in the lawsuit?
 6         A    I told them that it was a -- I'm not sure what
 7    the legal word is.  But I told them in there it states:
 8    If you sign this and if you -- if we had an impasse over
 9    something, I couldn't sue you and you couldn't sue me.
10    We would have to sit down at a table with an arbitrator
11    and arbitrate it out.
12         Q    Did you tell anyone what, if any, impact that
13    arbitration clause would have on their ability to
14    participate in this case?
15         A    No.
16         Q    But you did tell them that as a result of
17    signing the contract, if they had any issue with you or
18    with the club, they would have to arbitrate that dispute
19    and they couldn't bring their case in court?
20         A    Yes.
21         Q    Some of the people that you had -- that you
22    required to sign the contract in February of 2016, those
23    were people that were eligible to join in this lawsuit
24    based on their dates of working at the club, right?
25         A    Yes.
```

Darnell Gardner
January 30, 2017                                    34

```
  1        Q    But you didn't tell any of those people who
  2   may have been eligible to join the lawsuit -- you didn't
  3   have any discussion as to the effect of the arbitration
  4   agreement on their right to participate in the lawsuit
  5   in court?
  6             MR. McARTHUR:  Could you rephrase the
  7        question, please.  I object to the form of the
  8        question.
  9   BY MR. FRISCH:
 10        Q    Sure.  You said you didn't discuss -- other
 11   than telling people that the arbitration clause meant
 12   that they couldn't bring a case in court, they had to
 13   bring it in arbitration if they had an issue with the
 14   club --
 15        A    Right.
 16        Q    Right -- you didn't have any other
 17   conversation about their right to bring a case in court
 18   other than that --
 19        A    No.
 20        Q    -- is that correct?
 21        A    That's correct.
 22        Q    And did you discuss the impact of the
 23   arbitration clause on the exiting lawsuit and their
 24   ability to participate in the existing lawsuit?
 25        A    No.
```

Darnell Gardner
January 30, 2017                                     37

1      Q    Why did she want to leave being a house mom to
2  become a dancer?
3      A    More money.
4      Q    Generally can you describe to me the duties
5  performed by house moms.
6      A    They generally ask the girls the schedule,
7  make the schedule, bring in snacks, bring in feminine
8  hygiene products.  Generally just, I guess, for lack of
9  a better word, the girl's supervisor.
10     Q    The girl's supervisor.  Well, they oversee --
11 they are the most direct.  So you run everything, right?
12     A    Yes.
13     Q    But they are the direct supervisor of the
14 girls; is that right?
15     A    Yes.
16     Q    Has the house mom always kind of served in
17 that capacity at the direct supervisor of the day-to-day
18 activities of the girls?
19     A    Yes.
20     Q    So we have talked about people that have been
21 house moms.  We started with Kim Fowler, LeeAnn, we
22 don't know her last name.  Lawanda Laster you said was
23 one?
24     A    Yes.
25     Q    When was she a house mom?

Darnell Gardner
January 30, 2017                                    39

1        A     No.  She works at Toppers.

2        Q     I thought you said she's no long -- she's no

3   longer a house mom.  She's a bartender.

4        A     Right.

5        Q     Okay.  So from May 2015 or whenever she

6   stopped being the house mom, she's been a bartender at

7   Toppers ever since?

8        A     Yes.

9        Q     Was Brandy Brown also someone who was a house

10  mom?

11       A     She was.

12       Q     For what period of time was she a house mom?

13       A     Off and on probably at some point within the

14  last three years.  Like she wasn't always a house mom,

15  but she filled in for a house mom when someone couldn't

16  do it.

17       Q     On and off for the last three years?

18       A     Yes.

19       Q     How about your mom, Sandra Gardner, has she

20  ever worked as a house mom?

21       A     Yes, she's filled in as a house mom.

22       Q     For what period of time has she filled in as a

23  house mom?

24       A     She's currently filling in and helping me now.

25       Q     Is this the first time that she's worked as a

```
 1   house mom currently?

 2        A    The first time she's filled in as a house mom?

 3        Q    Yeah.

 4        A    Over the last year.

 5        Q    Over the last year.  Starting when?

 6        A    When LeeAnn and Kim left.

 7             MS. GARDNER:  Kelly.

 8             THE WITNESS:  Well, I don't think Kelly -- is

 9        Kelly Gardner in there?

10   BY MR. FRISCH:

11        Q    No.  Who is Kelly?

12        A    She's a house mom that died.

13        Q    When was that?

14        A    2015.

15             MR. McARTHUR:  Just do this to the best of

16        your recollection.

17   BY MR. FRISCH:

18        Q    Is Kelly Gardner -- was she any relation to

19   you?

20        A    Well, she's married to my cousin.

21        Q    For what period of time was she a house mom?

22        A    Three years.

23        Q    What were the circumstances of her death?

24        A    She had heart failure.

25        Q    You said Sandra Gardner has served on and off
```

1    as the house mom for the last year or so?

2         A    Yes.

3         Q    Prior to that, did she ever serve as the house

4    mom if someone wasn't there?

5         A    She would fill in occasionally.

6         Q    For what period of time -- ever since 1993 has

7    she filled in every once in a while?

8         A    Yes, as I needed her.

9         Q    So prior, it sounds like, and correct me if

10   this is incorrect, in the last year Sandra Gardner has

11   served in more of a full-time role as being a house mom

12   but prior to that it was more on a fill-in basis; is

13   that right?

14        A    Yes.

15        Q    Prior to this last year when she's come on

16   service as a full-time house mom, how often would you

17   say she filled in as a house mom?

18        A    Maybe once every couple of weeks.

19        Q    And that would be going back at least the last

20   five years prior to this year?

21        A    Well, no, because she ran -- we had another

22   club called Bootleggers that she was running then.  So

23   she ran Bootleggers, so she wasn't anywhere near

24   Toppers.

25        Q    For what period of time was Bootleggers in

 1    business?

 2         A    Bootleggers closed in 2015.  So 2012 to 2015.

 3         Q    What kind of business is Bootleggers?

 4         A    Country western bar.

 5         Q    Were you an owner of Bootleggers?

 6         A    The corporation was.

 7         Q    Toppers, the Defendant in this lawsuit, owned

 8    Bootleggers and Toppers International?

 9         A    Yes.

10         Q    What is the ownership structure of Toppers

11    International?

12         A    I'm 100 percent shareholder.

13         Q    Have you always been 100 percent shareholder?

14         A    Since 2004.

15         Q    Since 2004?

16         A    Yes.

17         Q    Who, if anyone else, was a shareholder prior

18    to you taking 100 percent ownership of Toppers

19    International?

20         A    Sandra had 100 percent ownership.

21         Q    And how was it -- was there some sort of

22    transaction under which you became the 100 percent

23    ownership?

24         A    I changed the corporate name and put

25    everything in my name.

Darnell Gardner
January 30, 2017                                    43

1        Q     What was the prior corporate name?

2        A     Mardi Gras, Inc.

3        Q     As a 100 percent shareholder, how do you get

4   paid from Toppers International?

5        A     I paid myself a thousand dollars a week from

6   Toppers.

7        Q     And that is regardless of the revenues?

8        A     If the revenues were not good that week, I

9   usually don't take that much.

10       Q     Okay.

11       A     But that's what I set it up as, but I don't

12  always take a thousand.

13       Q     How about Sandra, what, if anything, does she

14  get paid by Toppers?

15       A     House mom.

16       Q     Has she ever received any other pay from

17  Toppers?

18       A     No, no.

19       Q     How about --

20       A     Not since 2004.

21       Q     In 2004 how was she getting paid prior -- when

22  it was Mardi Gras rather than Toppers?

23       A     I guess she was taking the pool.  I was not

24  here.

25       Q     You were not involved?

Darnell Gardner
January 30, 2017                              45

1        Q    What does that mean?

2        A    I took 100 percent full control.

3        Q    What does that mean, you took full control?

4        A    That means I was -- I called myself GM, but I

5    had full control.  I hired; I fired.

6        Q    Did you hire --

7        A    I set all club policy.

8        Q    Did you discipline people?

9        A    Yes.

10       Q    When you say, I hired and fired, were you

11   responsible for or are you responsible for auditioning

12   entertainers?

13       A    I'm not house mom.

14       Q    House mom?

15       A    Yes.

16       Q    So is the house mom the person, exclusively

17   the person who makes decisions about whether

18   entertainers qualify to perform based on their

19   auditions?

20       A    House mom auditions them.  They tell me about

21   the audition.  They will probationally put them on the

22   schedule.  And when I come in -- and whenever I come in

23   and see the new hire, if I agree with it, they stay.

24   And if I don't, they go.

25       Q    But initially they get brought in on a

Darnell Gardner
January 30, 2017                                          46

 1   probational basis based solely on the audition from the

 2   house mom?

 3        A     Yes, yes.

 4        Q     For the entire time that -- for the last year

 5   that Sandra Gardner has served as the house mom, has she

 6   been responsible for those types of duties, auditions of

 7   entertainers, to determine whether they should be

 8   hired --

 9        A     Yes.

10        Q     -- for the club?

11        A     That is house mom duties.

12        Q     How about prior to this year when she was

13   working on a full-in basis, if somebody came in on a day

14   she was filling in, would she be responsible?

15        A     She would generally audition them that day.

16   If they came in that day to audition, we generally

17   audition them on the day they are there.

18        Q     How often would you say generally speaking

19   auditions are held or someone is being auditioned at the

20   club?

21        A     There is a potential audition every day except

22   Fridays and Saturdays.  We don't do auditions on Fridays

23   and Saturdays.

24        Q     So prior to a year ago when Sandra Gardner was

25   working as a house mom as a fill-in, you said it was

Darnell Gardner
January 30, 2017                              47

1    about once every two weeks?

2        A    Yes.

3        Q    So there would be an expectation, unless it

4    was a Friday or Saturday, she would have been

5    auditioning at least one person during those two weeks?

6        A    If they were there to audition, yes.

7        Q    So, like any house mom, basically an audition

8    that they saw of the entertainer, they would make the

9    initial decision as to whether someone should be put on

10   a probationary basis?

11       A    Yes.

12       Q    And that would be subject to you seeing them

13   when they are actually dancing during that probationary

14   period?

15       A    Yes.

16       Q    Did you generally agree with the decisions the

17   house mom made?

18       A    Yes; not always.

19       Q    Is it fair to say usually?

20       A    Yes, usually.

21       Q    So if a house mom decided to give somebody a

22   probationary opportunity to dance at the club, you

23   usually agreed with it?

24       A    Yes.

25       Q    Obviously there were instances where you

Darnell Gardner
January 30, 2017                                    48

1   didn't --

2        A    Yes.

3        Q    -- agree with it, but that was less frequent

4   than the instances where you did agree with them?

5        A    Yes.

6        Q    You said the house mom -- we talked about the

7   house moms' involvement in making decisions based on

8   auditions to hire people or to permit them to entertain

9   as a dancer at the club.  Are they similarly involved in

10  the decisions to terminate the relationship or the

11  employment with Toppers?

12       A    They will tell me whatever problems they are

13  having with the employee, with the entertainer.  And

14  then I will -- they will recommend whether they think

15  they should be let go or not, and then I will make the

16  final decision.

17       Q    Okay.  Is it similar to the hires basically

18  audition; do you more frequently than not accept the

19  recommendations regarding fires or terminations?

20       A    More typically than not.

21       Q    So is it fair to say typically you do rely on

22  their recommendations in making decisions for

23  terminations?

24       A    For the most part.

25       Q    Would it be fair to say that you, you give

Darnell Gardner
January 30, 2017                                    49

```
 1   weight, I guess, to the input of the house moms in

 2   making hiring and firing decisions?

 3        A    I do.

 4        Q    You retain the ultimate decision-making

 5   authority?

 6        A    I do.

 7        Q    And to the extent that your mom is or was a

 8   house mom, you give her the same kind of deference

 9   regarding her recommendations as in regards to hiring

10   people?

11        A    Yes.

12        Q    Same thing, you give her that kind of

13   deference as a house mom to decisions you make in

14   terminating people?

15        A    I give her, yes, I give her the same

16   deference.

17        Q    Well, did you give her more deference because

18   it's your mom and she's involved in the business?

19        A    No.

20        Q    She's been in the business for a lot of years,

21   right?

22        A    She opened it in '93, yeah.

23        Q    Prior to that she had worked in the business

24   as well, right?

25        A    Not really.
```

Darnell Gardner
January 30, 2017                                    50

```
1        Q    No?

2        A    No.

3        Q    Other than -- withdraw it.  Fair to say that

4    you run the day-to-day operations of Toppers?

5        A    Yes.

6        Q    And it's always been that way since 2004 when

7    you returned from Vegas?

8        A    Yes.

9        Q    Other than you and the house moms who are on

10   duty on any given day, are there any other people that

11   you would deem to be supervisory staff at Toppers?

12       A    I have a security guy who has been with me for

13   a while who I have given more and more responsibility

14   to.

15       Q    What kind of stuff can he do that other

16   employees or other workers can't do?

17       A    If I'm not there and there is a customer

18   complaint, he would be the one to deal with it.  I don't

19   usually get there until later on in the night.  So he

20   gets there, sets the bar, opens the door.  You know,

21   turns the lights on and gets the place ready to go.

22       Q    What's his name?

23       A    Sean Behr.

24       Q    Can you spell his first name and last name?

25       A    S-e-a-n, B-e-h-r.
```

Darnell Gardner
January 30, 2017                                    51

1        Q       How long has he been employed?

2        A       A year and a half.

3        Q       Is he -- is he paid directly as an employee of

4    the club or does he get paid some other way?

5        A       He is paid as security.

6        Q       How does he get paid?

7        A       From tip-out.

8        Q       From the house fees?

9        A       Yes.

10       Q       And when you say tip-out, the house fees and

11   the tip-out are the same thing, right?

12       A       Same thing, yes.

13       Q       Does he get any other wage paid to him

14   directly by any of the Defendants other than the portion

15   of the tip-out or house fees that he receives?

16       A       They generally tip their security and DJ's at

17   the end of the night in addition to the house fees.

18       Q       The entertainers do?

19       A       Yes.

20       Q       So, is that the only money that the security

21   gets paid?  They get paid a portion of the house fees or

22   tip-out, and then they separately get tipped out on top

23   of that?

24       A       Yes.

25       Q       And the additional tip-out at the end of the

Darnell Gardner
January 30, 2017                                          52

1    night, that comes directly from money that entertainers

2    have received from the patrons of Toppers?

3         A    Yes.  I guess, yeah, individual girls tip them

4    out.  So I assume it comes from monies that they got

5    from patrons.

6         Q    The tips they receive from patrons for doing

7    dances, right?

8         A    Yes, yes.

9         Q    Other than receiving pay as a portion of the

10   house fees that each entertainer pays and being tipped

11   out by the entertainers at the end of each night, does

12   the security receive any other money?

13        A    No.

14        Q    So they don't get paid a direct wage directly

15   from Toppers?

16        A    No.

17        Q    Has it always been like that?

18        A    Always.

19        Q    How about the house moms, how do they get

20   paid?

21        A    They get paid from tip-out also.  Are we going

22   to say house fees or tip-out?  Which would you rather

23   have me say?

24        Q    As long as they are the same.  I will just

25   distinguish between, I guess tip-out at the beginning of

1    the night which would be house fees?

2        A    Yes.

3        Q    Those are one and the same, I think we can

4    agree?

5        A    Yes.

6        Q    And then the tip-out at the end of the night

7    is the non-house fee tips?

8        A    Yes.

9        Q    Right.  So are the house moms paid in the same

10   manor that the security guard or security guards are

11   paid?

12       A    Yes.

13       Q    So, they get a portion of the house fee

14   tip-out at the beginning of the night that girls have to

15   pay?

16       A    Yes.

17       Q    They also get tipped out as a portion of the

18   tips received by entertainers from the patrons at the

19   end of the night as well?

20       A    Yes, generally when they tip out house moms,

21   it's because house moms also bring snacks and other

22   items they may need.  So essentially, I guess they are

23   tipping them out for bringing in supplies.

24       Q    Okay.  So kind of like paying them back for

25   the supplies that they brought in for the house mom?

Darnell Gardner
January 30, 2017                                54

1        A     Yes.

2        Q     You mentioned snacks.

3        A     Feminine hygiene products, baby wipes,

4   aspirin, Rolaids, stuff of that nature.  Anything that a

5   dancer could possibly need that night.

6        Q     What kind of snacks are we talking about that

7   house moms bring?

8        A     Pretzels, small bags of popcorn, Ramen

9   noodles, soups; things of that nature.

10        Q     They always have a stash of aspirin also or

11   some kind of pain medication?

12        A     Yes.

13        Q     Baby wipes?

14        A     Yes.

15        Q     They sell a package of baby wipes?

16        A     Yes.

17        Q     And I guess Rolaids would be package of

18   Rolaids?

19        A     Yeah.

20        Q     Is there a specific amount that the -- well,

21   going back to security for a second.  How much is the

22   house fee, or does it vary based upon what time somebody

23   gets there?

24        A     Exactly.  It's tiered on what time you get

25   there.

Darnell Gardner
January 30, 2017                           55

1        Q     Explain to me what the different tiers are.

2        A     We open at 7 so the 7:00 house fee is $20,

3     8:00 is 30, 9:00 is 40, 10:00 is 50, and then we

4     generally don't let anybody come in after 10.

5        Q     On the schedule are people designated for

6     certain times or just for certain dates?

7        A     They are designated for certain times and

8     dates.  The house mom goes to each girl starting on

9     Thursday and starts the schedule for next week, and

10    says, okay, we're doing the schedule; what do you want

11    to work next week.  And then they will tell the house

12    mom what days they prefer to work next week.

13       Q     Okay.  And is there a minimum numbers of days

14    that entertainers are required to work?

15       A     We're a smaller club, so I would prefer they

16    work four days.

17       Q     In fact they are required to work four days a

18    week, right?

19       A     Not all.  Some only work three.  It's all

20    depending on circumstances and situations.

21       Q     Okay.  But generally, the fourth day is or

22    four days a week is what is expected, right, absent some

23    kind of exception?

24       A     Yes.

25       Q     So unless it was a student or something like

Darnell Gardner
January 30, 2017                              56

1    that, they are expected -- they are required to work

2    four days a week?

3          A    Yes.

4          Q    Is there a rule in place that entertainers

5    have to work in addition to working four days a week,

6    they have to work at least one Monday, Tuesday or

7    Wednesday in order to be able to work weekend shifts?

8          A    I prefer they work a small, smaller -- a

9    slower night to also work a busier night.  I don't let

10   anybody come in and just work weekends.

11         Q    And people -- so people are required to work

12   one of the slower nights, Monday, Tuesday or Wednesday

13   of the four days they are required to work in order to

14   be able to work weekend shifts?

15         A    Yes.

16         Q    And that's a written rule of the club?

17         A    I'm not sure if it's written.  That's the way

18   I instruct the house moms to do it.  It may be in the

19   contract, but I don't remember if they are.  I

20   instruct them --

21         Q    But that's your understanding, it is one of

22   the rules?

23         A    Yes.

24         Q    Has that always been a rule?

25         A    Yes.

Darnell Gardner
January 30, 2017                                        57

1        Q     That's applicable to all entertainers?

2        A     Yes.

3        Q     We started talking about the tiered house fee

4    amounts.  Of the house fees that are collected, what

5    portion of the house fees get distributed to security on

6    a given shift?

7        A     It's usually two security, one DJ, one house

8    mom.  So probably 50 percent of it goes to security.

9        Q     Is that kind of like a set thing, usually the

10   numbers?

11       A     There's usually four support staff there a

12   day.  So it gets divied up by four, and security, it's

13   two of them.

14       Q     So they each get an equal 25 percent share of

15   the house fees?

16       A     Security who opens gets 60 percent of the

17   share, and the guy who comes in at 10 gets 40 percent of

18   the share.

19       Q     And the remaining 50 percent, does the DJ and

20   house mom split it equally?

21       A     Yes.

22       Q     Has that always been the split, 50 percent to

23   the two security guards, 25 percent to the house mom and

24   25 percent for the DJ?

25       A     That's the way it's always been.

Darnell Gardner
January 30, 2017                                        58

1        Q    So that's one type of house fee or tip-out

2    that we have been discussing.  And the house fee, that's

3    the money that is paid at the beginning of the night

4    when the entertainer gets to the club?

5        A    Yes.

6        Q    They have to pay the tiered amount that we

7    were talking about in your deposition, between 20 and

8    $50 when they first get to the club; is that right?

9        A    Yes.

10       Q    Has that tiered system always been what it's

11   been?

12       A    It's changed over the years.  We used to open

13   at 4, and then we weren't busy.  So over the years we

14   have pushed back the opening to where we're currently at

15   7.

16       Q    When was that change made, do you remember?

17       A    Seven, eight years ago.

18       Q    So apparently for the last five years, it's

19   always been opening at 7?

20       A    Yes.

21       Q    So the tiered system would be the one that's

22   been in place for at least the last five years?

23       A    Yes.

24       Q    Okay.  With regard to end of the night

25   tip-outs that we were discussing with regard to -- I

Darnell Gardner
January 30, 2017                                  59

```
 1   think you said the DJ's, the house mom, and the security
 2   also get tipped out by each of the entertainers at the
 3   end of a shift --
 4       A    Yes.
 5       Q    -- from the monies that they have received as
 6   tips from the patrons of the club?
 7       A    Yes.
 8       Q    Is there a minimum amount that they are
 9   expected to tip out to the DJ?
10       A    To the DJ, it's usually $10 or 10 percent,
11   whichever is greater.
12       Q    How about to the house mom?
13       A    Usually $5.
14       Q    So, just a set $5, or is it $5 or five
15   percent, whichever is greater?
16       A    I said $5 is the minimum, and they -- usually
17   that's what they tip is five.
18       Q    You set the minimum of $5?
19       A    Yes.
20       Q    That's usually what they give?
21       A    That's usually what they give, I guess.
22       Q    So they have to at least give five, but they
23   can give something more?
24       A    They can give more.  I generally assume they
25   give five, but I don't track that.
```

Darnell Gardner
January 30, 2017                                        60

1      Q    But you set the minimum at five?

2      A    Yes.

3      Q    The same thing with the DJ, are you the one

4  that sets the rate of $10 or 10 percent, whichever is

5  greater?

6      A    I did.

7      Q    So the minimum that they would have to give

8  is -- they could give more, but they have to give $10?

9      A    Yeah.

10     Q    And how about for security?

11     A    Usually they give like $10 for both of them.

12  $10 for them to split.

13     Q    Okay.  And again that's a required amount that

14  you set the minimum of $10?

15     A    Yes.

16     Q    They could give more, but they have to give at

17  least ten?

18     A    Yes.

19     Q    Is there anyone else that entertainers are

20  required to tip out at the end of the night?

21     A    No.

22     Q    Like bartenders?

23     A    No.

24     Q    How about is there anyone else that receives

25  any portion of the house fees?

Darnell Gardner
January 30, 2017                                    61

```
 1        A     No.

 2              MR. FRISCH:  We have been going for a while.

 3        Do you want to take a quick break?

 4              THE WITNESS:  Yeah.

 5              (A brief recess was held.)

 6   BY MR. FRISCH:

 7        Q     We're back on the record.  And Mr. Gardner, I

 8   just want to remind you you're still under oath.

 9              Do you understand that?

10        A     Yeah.

11        Q     Okay.  Does Toppers own, rent, or have some

12   other arrangement with the space in which the club is

13   contained?

14        A     We rent the space.

15        Q     Do you know what the annual rent is for the

16   space?

17        A     It's $10,212 a month, so times 12.

18        Q     Okay.  So roughly $120,000 a year?

19        A     Yes.

20        Q     Has that changed over time?

21        A     Yes.

22        Q     Going back say five years ago, do you remember

23   what the monthly rent was?

24        A     8,700 maybe.

25        Q     So, still over $100,000 per year?
```

Darnell Gardner
January 30, 2017                                              62

```
 1        A     Yes.

 2        Q     Does Toppers have any kind of an advertising

 3   or marketing budget?

 4        A     Not really.

 5        Q     Are you familiar with tax returns that Toppers

 6   files with the Division of Corporation each year?

 7        A     Yes.

 8              (Plaintiff's Exhibit No. A was marked for

 9        identification.)

10   BY MR. FRISCH:

11        Q     I'm going to show you what has been previously

12   Bates stamped by the Defendants as Defendants 2639

13   through Defendants 2674 which is a compilation of tax

14   returns.  On the top Bates number 2639 through 2649

15   appears to be Toppers International 2013 tax return.

16              I'm going to ask you to take a look at that

17   please and flip through, take the time you need, and

18   tell me when you have had a chance to review it.

19        A     Uh-huh.

20        Q     Line 11 on the first page there, the page at

21   the bottom is stamped 2639, Line 11, it says rent.  Do

22   you see that?

23        A     Uh-huh.

24        Q     It says $114,519?

25        A     Right.
```

1        Q     And that would be the annual rent as you just

2   described?

3        A     Yes.

4        Q     Then Line 16 lists as an item advertising.  Do

5   you see that?

6        A     Yes.

7        Q     And that lists $15,117?

8        A     Yes.

9        Q     Do you know what that amount is?

10       A     For advertising?

11       Q     Yes.

12       A     That could have been newspaper advertising.

13  It could have been advertising for like a mail review.

14  Could have been advertising for a billboard.  I don't

15  set a rate.  I advertise as I need to.

16       Q     So there is no specific amount designated for

17  it, but you do advertise?

18       A     I do advertise, yeah.

19       Q     And the club -- okay.  The entertainers, they

20  are not required to advertise on behalf of the business,

21  right?

22       A     No.

23       Q     That's something that the club does, that you

24  do?

25       A     Yes.

Darnell Gardner
January 30, 2017                                            64

1        Q    Okay.  And I'm just going to show you for

2    identification Defendant Toppers International, Inc.'s,

3    responses to Plaintiff Christie Burrell's first request

4    for admissions to Defendant Toppers International, Inc.

5             And specifically Page 3 there is a statement

6    that I will represent to you the Defendants made in the

7    request for admissions that I have highlighted just a

8    portion of in response to request for admission 21.

9             And I will read that for the record.  It says:

10   Plaintiff did not make any investments in the

11   enterprise.  However, Plaintiff was required to provide

12   her own apparel, makeup, and time to work as an

13   independent contractor at Toppers.  And I will give it

14   to you so you can also read it.

15            Do you agree with that statement?

16       A    Yeah.

17       Q    That's a true statement, right?

18       A    Yes.

19       Q    I want to take a step back and get some

20   background information that I neglected to get from you

21   earlier.

22            Have you ever been convicted of felony?

23       A    No.

24       Q    Have you ever been convicted of a misdemeanor?

25       A    Yes.

Darnell Gardner
January 30, 2017                                    68

1      Q    Was Mardi Gras in the same space that Toppers

2  currently is in?

3      A    Yes.

4      Q    Other than the name, was there any material

5  difference between Mardi Gras and Toppers?

6      A    It was just a regular disco-tech.  It was not

7  a gentlemen's club.

8      Q    Did you or your mother have any specific

9  experience in the industry that led you to open Mardi

10 Gras?

11     A    No.  The dance club Mardi Gras?

12     Q    Yeah.

13     A    No.

14     Q    Okay.  How about later on -- I guess the

15 company Mardi Gras that ran the gentlemen's club --

16     A    Okay.

17     Q    -- did you or your mother have any specific

18 experience in the industry that led you to open --

19     A    No.

20     Q    So how did you decide to get into the

21 gentlemen's club business?

22     A    We were at a dance club, and then we had a

23 relationship with the downtown police department.  And

24 one of the police officers said, you know, if I were

25 you, I would get into the adult nightclub business

Darnell Gardner
January 30, 2017                                    69

1    before they changed the laws.  So we researched the

2    laws, came down here and did a little homework and then

3    opened Toppers.

4         Q    How long did you have Mardi Gras before you

5    made, before it turned into Toppers?

6         A    Eight months.

7         Q    And at the time that you opened Toppers as a

8    gentlemen's club in 1993, neither you nor your mother

9    had any personal experience working in a gentlemen's

10   club.

11        A    No.

12        Q    Prior to the time you opened as Mardi Gras,

13   did either you or your mother have any experience

14   working in the nightclub business?

15        A    Not really, no.

16        Q    What do you mean not really?

17        A    No.

18        Q    So how did you decide to open a nightclub in

19   the first place?

20        A    We were in Atlanta looking for something to do

21   and wanting to work for ourselves and were flipping

22   through the newspaper when it said bar, club for rent in

23   Athens, Georgia.

24        Q    That was it?  You said --

25        A    That was it.

1    And we hammered out what I would do.  And then in 2004

2    we reincorporated it and I took over.

3        Q    So tell me -- so in 2003 you came back and you

4    discussed with Sandra Gardner a plan by which you would

5    take over Toppers from her?

6        A    Yes.

7        Q    And then you were going to change the

8    corporate entity as part of that as you described

9    earlier?

10       A    Yes.

11       Q    What was the sum and substance of that

12   conversation that you had with your mom?

13       A    One of the trusted people that she had just

14   left to go work for the police department.  She really

15   didn't want to do the day-to-day every day.  She really

16   wanted to retire and take some more time off.

17            So I told her I would take over Toppers if she

18   would give me 100 percent control, and she agreed.

19       Q    So between 2003 and 2004 when you

20   reincorporated, were you just working there or working

21   for your mom?

22       A    No, was just hanging out.  I had saved some

23   money so I really wasn't doing anything.

24       Q    Were you at the club on a day-to-day basis or

25   just hanging out?

Darnell Gardner
January 30, 2017                          77

1    It's their commercial.  So all girls -- plus all girls

2    want to go on stage anyway.

3         Q    You require them to go on stage?

4         A    I don't require them.  They just go on stage.

5    Nobody has ever asked not to go on stage.

6         Q    It's not an option, I guess, right?

7         A    I would let them if somebody asked not to, but

8    nobody has ever asked not to.

9         Q    Prior to the time that you worked at Sapphire,

10   what was the house fee setup at Toppers?

11        A    I don't even remember.

12             (Plaintiff's Exhibit No. B was marked for

13        identification.)

14   BY MR. FRISCH:

15        Q    I'm going to show you what has been marked as

16   Plaintiff's Exhibit B for purposes of the deposition.

17   It's five pages.  It's entitled:  Dancer, General

18   Information.

19             Let me ask you to take a look at it, review

20   it, and look up when you have had a chance to review it.

21             Have you had a chance to review these five

22   pages entitled Dancers, General Information?

23        A    Uh-huh.

24        Q    You have to say yes or no.

25        A    Yes.

Darnell Gardner
January 30, 2017                              78

```
 1          Q    Do you recognize this document?

 2          A    I do.

 3          Q    What do you recognize it to be?

 4          A    Our general information sheet that comes in

 5     the contract.

 6          Q    So, this is part of the contract?

 7          A    Yes.

 8          Q    What type of contract -- is this a part of the

 9     independent contract?

10          A    I believe it is.

11          Q    Who created this document?

12          A    It was created over years.  I took most of the

13     information I learned from other clubs and just put it

14     together into the independent contractor's contract.

15          Q    Okay.  And you know what, why don't we -- is

16     this -- are these rules that every entertainer is

17     subject to who works at Toppers?

18          A    Subject to, yes; follow, not always.

19          Q    But they are required to -- they are required

20     to follow them whether they do or not; is that right?

21          A    Yes, they are required to follow them.  They

22     don't always follow them.

23          Q    Is there anything in here that you, that

24     doesn't accurately represent a rule or a requirement of

25     Toppers?
```

Darnell Gardner
January 30, 2017                              81

1        A    Yes.

2        Q    Meaning Toppers requires each one of these

3    things to be followed or done by each of the

4    entertainers that performs work at Toppers?

5        A    Yes.

6        Q    Is there any exception to that in here?

7        A    Some, some instances were whatever the

8    requirement would be and a dancer doesn't do it

9    depending on the circumstances, we just let it slide.

10       Q    Okay.  So sometimes you will let it slide, but

11   these are all requirements that are imposed by Toppers

12   and you --

13       A    Yes.

14       Q    -- on the entertainers?

15       A    Yes.

16            (Plaintiff's Exhibit No. C was marked for

17            identification.)

18            MR. FRISCH:  I'm going to show you now a

19            two-page document that appears to be part of the

20            independent contract as well.  At the top it says

21            Independent Contract - Reinstatement Fees.  Please

22            take a look at that.

23            MR. McARTHUR:  Thank you.

24   BY MR. FRISCH:

25       Q    Review that, and let me know when I can ask a

1  few questions.  You have had a chance to review

2  Exhibit C?

3       A    Yes.

4       Q    Do you recognize Exhibit C?

5       A    Yes.

6       Q    What do you recognize it to be?

7       A    Part of the independent contractor's contract.

8       Q    And this was something that created by Toppers

9  and by you as part of the business of Toppers?

10      A    Yes.

11      Q    Something that has been maintained in the

12  ordinary course of business of Toppers, in the ordinary

13  course of business?

14      A    More or less.

15      Q    And what exactly is it?

16      A    It's what I guess, for lack of a better word,

17  if I impose this fine on an entertainer, and she chooses

18  not to pay say a fine and just wants to leave, I allow

19  her to leave.  But if she wants to come back and start

20  working again, to be reinstated on the schedule that's

21  the fine.

22      Q    Okay.  So someone does one of these things --

23  I will call them offenses, one of the things that is

24  listed on here associated with a fine, that would render

25  them unable to continue working at Toppers unless they

1    pay the fine associated with it?

2         A    Unless they pay the fine or unless they have a

3    good reason why they should not have to pay the fine.

4         Q    So, for example, number two says:  Missing

5    stage call, $10.  Do you see that?

6         A    Right.

7         Q    So if someone has a turn to dance on stage --

8    is that what a stage call is when it's their turn to

9    dance?

10        A    Yes.

11        Q    So, if an entertainer fails to dance on stage

12   when their name has been, has been called or when it's

13   their turn to dance on stage, they would no longer be

14   able to dance at Toppers unless they pay a $10 fine?

15        A    Usually if they miss the stage call and they

16   had a legitimate reason why they missed the stage call,

17   we don't even worry about it.  Missing the stage call

18   for a -- I use it as -- I call Toppers a show.  Missing

19   a stage call stops the show.

20             And so the DJ -- usually for something,

21   missing a stage call, missing stage calls a second time

22   or third time, I wouldn't see it.  The DJ would see it.

23   So the DJ would decide if he would impose that fine or

24   not.

25        Q    So the DJ makes that decision?

Darnell Gardner
January 30, 2017                                    84

```
 1        A     On the missing stage call.

 2        Q     So then if someone is fined, they are only

 3   allowed or permitted to continue working if they pay the

 4   fine?

 5        A     Unless -- if he imposes that fine.

 6        Q     Right.

 7        A     If he doesn't impose the fine, then they don't

 8   have to pay it.

 9        Q     Obviously.  But typically but these things are

10   for --

11        A     Fineable offenses.

12        Q     Fineable offenses.  And who is subject to

13   these fines, every entertainer who commits what is

14   referred to as an offense?

15        A     Yes.

16        Q     So, Number 14 says:  Not dancing while on

17   stage.  Do you see that?

18        A     Yes.

19        Q     Is that also something -- so this is a rule

20   that applies to -- a fine that's imposed on anyone who

21   does that, that goes on stage but they are not dancing?

22        A     Yes.

23        Q     Who would make that decision?

24        A     DJ.

25        Q     Is that the DJ again because he sees it?
```

Darnell Gardner
January 30, 2017                              85

1        A     Yes.

2        Q     So what would happen if he sees --

3        A     He would see a dancer, let's say, sitting on

4   the table not dancing, so he would probably -- if I was

5   a DJ, he would probably call her off stage, call her up

6   in the booth, ask her what happened.  Depending on what

7   she said, he would impose the fine or he couldn't.

8        Q     What happens to the money?  If a fine is

9   imposed and paid by an entertainer, what happens to that

10  money?

11       A     It goes into the tip-outs.

12       Q     So it gets combined with the money from the

13  house fees?

14       A     Yes.

15       Q     Because we talked about tip-outs at the end of

16  the night, and we have also talked about the tip-outs

17  being house fees.

18       A     Combined with house fees.

19       Q     Okay.  So ultimately it gets split by the

20  security, the DJ, and the house mom?

21       A     Yes.

22       Q     These fines, to the extent that they are

23  charged and then an entertainer has to pay, where does

24  that money come from?  Is that from their tips?

25       A     I assume so, yes.

Darnell Gardner
January 30, 2017                                        86

1        Q    Are there any fines listed -- there are 30

2   fines listed on this two-page document, correct?

3        A    Yes.

4        Q    Is there anything on this two-page document

5   that you don't believe was a fineable offense, or is

6   this somehow inaccurate, someone couldn't be fined if

7   they did this stuff?

8        A    A lot of this is a scare tactic.  A lot of

9   these fines we've never instituted, but we put it on

10  there so they don't do it.

11       Q    But if someone did do it, they could be fined?

12       A    They could be.

13       Q    So each one is truly a fineable offense?

14       A    Yes.

15       Q    What you are saying is you tell people, these

16  are the rules.  If you follow the rules, you won't get a

17  fine, but if you break these rules -- it helps to not

18  break the rules in the first place?

19       A    Correct.

20       Q    Is there anything on here that would not be

21  subject to the fine associated with it if it occurred or

22  if an entertainer did it?

23       A    They stay on their knees way longer than ten

24  seconds, they do physical contact longer than 15

25  seconds, they leave without notifying the management or

Darnell Gardner
January 30, 2017                            87

1   DJ, they go in the executive rooms without notifying the

2   bar.

3           Q      People are subject to fines for that, right?

4           A      Yes.

5           Q      All that stuff?

6           A      Yeah.

7           Q      Who makes -- other than the things we talked

8   about the DJ deciding, which as I recall, generally

9   stage conduct or lack of appearing on the stage --

10          A      Uh-huh.

11          Q      -- who makes the decision about whether these

12  fines are going to be imposed or not?

13          A      Most of the time that would be my call,

14  whether they are fined on, say, any type of abuse

15  towards a customer, that would be my call.

16          Q      How about the house moms, do they have any

17  participation deciding whether someone should be fined

18  or not?

19          A      They can -- if I'm not there, they can see the

20  offense, they can fine them, and then it will be up to

21  me as to whether it stands or not.

22          Q      So if it doesn't stand, so does that mean that

23  someone will get a refund?

24          A      Yes.

25          Q      So someone gets fined --

1        A       A lot of times they fine them and they don't

2    pay it, and they talk to me and then I decide if they

3    actually pay it or not.  So just because they got the

4    fine does not mean that they pay the fine.

5        Q       So, to the extent your mom from time to time

6    has been a house mom, does this mean that she makes

7    these decisions at least initially as to whether someone

8    should be fined for some of this conduct that's listed

9    on here?

10       A       She can.

11       Q       And she has?

12       A       She has.

13       Q       Just like all the house moms?

14       A       Yes.

15       Q       How often would you say at least one of these

16   fines is imposed in a given shift on someone, on one or

17   more entertainers?

18       A       How often?

19       Q       Yep.  Is it every shift, once a week, five

20   times a week?

21       A       Maybe couple of times a week.

22       Q       So approximately two times a week?

23       A       Two to three maybe.

24       Q       Some entertainer is fined for one of these

25   offenses listed on here?

Darnell Gardner
January 30, 2017                                    89

```
1         A     Possibly, yes.

2         Q     Are there other things that are fineable or

3   that --

4         A     No, that's pretty much it.

5         Q     That is not listed on here?

6         A     That's pretty much it.

7         Q     This list of fines, Exhibit C, that's equally

8   applicable to every entertainer?

9         A     Yes.

10        Q     And it always has been?

11        A     Yes.

12        Q     Prior to February 2016 when Toppers put in --

13  when Defendants put in the new contract which allowed

14  people to elect between being treated as an employee and

15  an independent contractor, is it accurate to say that no

16  entertainer was ever paid a direct wage by Toppers or by

17  you prior to February 2016?

18        A     Yes.

19        Q     And the only money they received was tips from

20  Defendant's patrons?

21        A     Yes.

22        Q     I think you said the club opens and it has for

23  the recent past at least going back six or seven years

24  it opens at 7 p.m.; is that right?

25        A     Yes.
```

Darnell Gardner
January 30, 2017                                    90

```
 1        Q    What time does it typically close?
 2        A    We have to stop serving at 2, and we have to
 3   have everybody out by 2:30.
 4        Q    If someone works a shift on any given day, the
 5   earliest they could be in is at 7?
 6        A    Yes.
 7        Q    And the latest they would leave is when?
 8        A    2:15, 2:30.
 9        Q    I think we talked earlier in your deposition
10   about the necessity of an audition for an entertainer
11   before as a prerequisite to them being permitted to work
12   at Toppers on a probationary basis, right?
13        A    Yes.
14        Q    Is that something that everyone is subject to,
15   they have to audition?
16        A    Well, normally, sometimes somebody walks in
17   and they are attractive enough that you waive the
18   audition.
19        Q    So typically --
20        A    Typically.
21        Q    -- people are required to audition unless it's
22   a real hottie?
23        A    Then you waive the audition.
24        Q    Was every -- are you aware of any Plaintiff in
25   this case that was not required to audition in the
```

Darnell Gardner
January 30, 2017                              91

1   manner you talked about earlier with the house mom?

2        A    No.

3        Q    As far as you know every -- all the Plaintiffs

4   in this case including Ms. Burrell and all the opt-in

5   Plaintiffs were required to do an audition?

6        A    I believe so.

7        Q    And during the probationary period, you had to

8   observe them to determine whether they could stay?

9        A    Yes.

10       Q    Who determined the minimum cost of dances at

11  the -- on behalf of the club?  Is that something that

12  you did?

13       A    I did.

14       Q    Is that something that you still do?

15       A    Yes.

16       Q    And that's something that you have done for

17  the last six, seven years?

18       A    Yes.

19            MR. FRISCH:  Okay.  This is a good time to

20       take a break for lunch.

21            (A brief recess was held.)

22            MR. FRISCH:  Okay.  Let's go back on the

23       record.

24  BY MR. FRISCH:

25       Q    We have just taken lunch.  You understand

Darnell Gardner
January 30, 2017                                    92

1    you're still under oath?

2        A    Yes.

3        Q    Any testimony that you gave in the morning

4    that you feel compelled to change for any reason?

5        A    No.

6             (Plaintiff's Exhibit No. D was marked for

7        identification.)

8    BY MR. FRISCH:

9        Q    Let me show you a one-page document that's

10   marked as Plaintiff Exhibit D for your deposition.  I

11   will ask you a few questions about that.  Have you had a

12   chance to review Exhibit D?

13       A    Yes.

14       Q    Do you recognize Exhibit D?

15       A    Yes.

16       Q    What do you believe Exhibit D to be?

17       A    It looks like a dancer schedule.

18       Q    Is this the dancer schedule that was created

19   by the house mom, whoever it was at that time?

20       A    Yes.

21       Q    And this would have been the schedule that

22   dictated to each dancer or each entertainer when they

23   had to be at the club to work?

24       A    Yes.

25       Q    I see boxes.  There are names on the left-hand

Darnell Gardner
January 30, 2017                                    98

1   on Monday, can I switch to Wednesday, or can I switch to

2   Thursday.  On a case that they can't work Wednesday or

3   Thursday, and they just can't come in on Monday, they

4   call the house mom and say I can't show up; I have got

5   this going on.  And the house mom will just write down

6   that she didn't show up.

7        Q    But they do have to call in.  It wouldn't be

8   okay if they just don't show up, right?

9        A    Right.  We ask them to call the house mom.

10       Q    So they call the house mom if they are sick or

11   something comes up?

12       A    Correct.

13       Q    They have to be in touch with the house mom to

14   let them know?

15       A    Yeah, to let them know.  We're not a big club,

16   so like I say, we don't run a thousand girls.  So every

17   girl that we have is important.  So when one misses and

18   we can't replace her, then that makes us run a short

19   shift is what we call it.  It's called a short shift.

20       Q    How about switching shifts, does that have to

21   be approved by the house mom?

22       A    No.  The girl can say I want to switch from

23   Monday to Wednesday.  Once again, because we don't have

24   a lot of girls, they don't try to overload the schedule

25   like a bunch of girls on Wednesday and no girls on

Darnell Gardner
January 30, 2017                                    100

```
 1    and -- I mean the entertainer initials that's what I'm

 2    agreeing to.

 3              (Plaintiff's Exhibit No. E was marked for

 4         identification.)

 5    BY MR. FRISCH:

 6         Q    I show you what has been marked as Plaintiff's

 7    Exhibit E for your deposition.  And for the record it's

 8    Bates stamp 2504 through 2509.  Do you recognize

 9    Exhibit E?

10         A    Yes.

11         Q    What do you recognize it to be?

12         A    Part of our independent contractor agreement.

13         Q    Along with Exhibit B that we looked at

14    earlier, the Dancer General Information sheet, if we add

15    this, that would be the entire contract?

16         A    That's D?

17         Q    B as in boy.  B is the Dancer General

18    Information sheet?

19         A    Yes.

20         Q    Okay.  So that's the full contractor

21    agreement?

22         A    Yes.

23         Q    And that's the agreement that you had -- prior

24    to February 2016 you had every entertainer sign in order

25    to work at Toppers?
```

Darnell Gardner
January 30, 2017                                   102

```
 1            MR. FRISCH:  We were talking about prior to
 2       February of 2016.
 3   BY MR. FRISCH:
 4       Q    Everyone who has signed the contract from
 5   February 2016 forward, their contracts are all the same
 6   as one another, right?
 7       A    Yes.
 8       Q    With the exception as to which one they made
 9   as to whether they want to be an employee or an
10   independent contractor?
11       A    Yes.
12            (Plaintiff's Exhibit No. F was marked for
13       identification.)
14   BY MR. FRISCH:
15       Q    Let me show you now what has been marked as
16   Plaintiff's Exhibit F for purposes of your deposition.
17   Do you recognize Exhibit F?
18       A    Yes.
19       Q    What do you recognize it to be?
20       A    That's the Executive Room Sign-in sheet.
21       Q    That's just when people take a customer back
22   to the executive room?
23       A    Correct.
24       Q    When exactly is this filled out?
25       A    As soon as a dancer persuades a guy to go into
```

Darnell Gardner
January 30, 2017                                              103

1  executive.  They go and get the waitress who then checks

2  the time because it's based on hourly and half hourly.

3  Checks the time, assigns them a room, and assigns the

4  time.

5            For example, Line 1, Heather went in at 10:10,

6  came out at 11:10.  Her waitress was Lawanda.  They were

7  in Room 4.  He paid $50 on the credit card for the room.

8  So he paid for an hour.  50 is an hour; 25 is a half

9  hour.

10       Q    So he was in there for an hour and he paid $50

11  for an hour?

12       A    Correct.

13       Q    Okay.  And what happens with the $50?

14       A    On a credit card it goes through the cash

15  register.  We have a POS now, but it was a cash

16  register.  So that is what he paid me for time.

17       Q    Okay.  And so you keep --

18       A    I keep.

19       Q    Does the club keep the $50?

20       A    Fifty bucks he paid me for the time.  For this

21  she made 250.

22       Q    How do you know that?

23       A    Because it's set at 250.  I set it 250 and

24  125.  So she made at least 250.  Let me say that.

25       Q    What do you mean you set it at?  I'm not

1    clear.  What are you setting --

2          A    Half an hour for an executive room is 125 per

3    girl, 25 for a room rental.  An hour is 250 per girl, 50

4    per room rental.  So, an hour essentially cost a

5    customer 300, and a half an hour cost him 150.

6          Q    What, what is the executive room?  Does that

7    mean you are alone with a girl?

8          A    It's an enclosed room where the girl and the

9    patron are in there, just those two.

10         Q    And you have established the cost for that?

11         A    We set the cost.  The minimum cost for that is

12   250 and 125.  That's the minimum.  Some girls charge

13   more; some girls charge less.  The only charge that I

14   know for a fact is the 25 and 50.  The girl may have

15   charged him 300.

16         Q    Okay.  But you set the minimum rate the girls

17   are to charge also?

18         A    Yes.

19         Q    So, you set the minimum.  You set the cost of

20   the room which is the 25 for half an hour, right, or 50

21   for an hour?

22         A    Correct.

23         Q    And you also set the minimum for the girl

24   which is 125 for a half an hour or 250 for an hour?

25         A    Correct.

Darnell Gardner
January 30, 2017                                    105

1        Q     Has it always been like that?

2        A     Pretty much, yes.

3        Q     Are there other charges that you set that are

4   minimums for the girls to charge, like, for example,

5   like a lap dance at the club?

6        A     There is another room.  There is another area

7   in the club.  That's called -- this is called the

8   executive room.  The other club is called the VIP room.

9              In the VIP room, the patron pays ten bucks to

10  go back there.  He gets a wristband to show he has paid

11  the $10 for that hour, and it's $10.  During that hour

12  he gets as many lap dances as he wants from whomever he

13  wants.  In the space of an hour, he can take five

14  different girls back there and get five different

15  dances.

16             The only difference between that and this is

17  this is regulated one customer-one girl the whole amount

18  of time.  So the other one, however many girls he can

19  fit in an hour, he can go back there.

20       Q     $10 is just to have the right to go to the VIP

21  area?

22       A     Yes.

23       Q     Is there -- in the club, can people get a lap

24  dance in the actual club or do they have to go in the

25  VIP or executive area?

Darnell Gardner
January 30, 2017                              106

```
 1        A     They have to go in the VIP or the executive.
 2   The only dances they get in the club are the floor
 3   dances which is sitting wherever you may be sitting in
 4   the club and the entertainer dancing in front of you.
 5        Q     Have you set a minimum charge?
 6        A     $10.
 7        Q     Okay.  So, a girl has to be tipped at least
 8   $10 for a floor dance?
 9        A     Yes.
10        Q     That's something that you set?
11        A     Yes.
12        Q     If the tip to the girl in the executive room
13   is paid by credit card, is that something that you do?
14        A     Yes.
15        Q     So someone can pay by credit card if they
16   want?
17        A     Yes.
18        Q     If someone pays the girl's tip by credit card,
19   does the club take any portion of that credit card tip,
20   or does she get it free and clear?
21        A     She takes -- we charge him for running it on a
22   credit card.  She gets the whole amount of the dance if
23   it's on a credit card.  She would get it on that sheet
24   there in Topper dollars because he didn't actually pay
25   cash for it.
```

Darnell Gardner
January 30, 2017                                    123

1   Exhibit H?

2        A     Yes, I do.

3        Q     What do you recognize it to be?

4        A     This is a Dancer Check-In sheet.

5        Q     Is this the type of check-in sheet where we

6   would see who worked on any given shift and see what

7   time they got there?

8        A     Yes.

9        Q     On Exhibit H, we'll just go through the

10  information that's on there so we know how to read it.

11  On the left-hand side, the first column it says Dancer

12  and then a bunch of names.  Are there 18 people on this

13  one?

14       A     Yes.

15       Q     Okay.  So, those 18 people, those were the

16  dancers or entertainers that worked that given shift on

17  that day?

18       A     Yes.

19       Q     What's the date on that one?

20       A     Excuse me, January 2nd, 2015.

21       Q     Then it says Scheduled Time in the next

22  column, right?

23       A     Yes.

24       Q     And that would be the time that they were

25  scheduled to work?

 1   late that day?

 2        A    No.

 3        Q    If they did arrive late, would they be fined

 4   or made to pay additional money?

 5        A    They could.  If they called the house mom and

 6   had a legit reason, they probably just were late.

 7        Q    Then the next column says Check-In.  Do you

 8   see that?

 9        A    Correct.

10        Q    What does that mean?

11        A    That means if, Line 1, Missy was scheduled at

12   7, got there at 6:30, checked in with the DJ at 7:00

13   which means that she was ready to go.

14        Q    She's ready to work?

15        A    She's ready to work.

16        Q    Okay.  The next column over says Fine?

17        A    Yes.

18        Q    Would that be only a fine with respect to

19   checking in late or --

20        A    Checking in.  It also would be a fine for the

21   DJ.  If he fined her, he would go up to the front.  The

22   front door is right behind the DJ.  So he would go out

23   of the thing and say Missy missed stage, $10, and that

24   would go in the Fine.

25        Q    So anyone that was fined -- is the DJ the only

Darnell Gardner
January 30, 2017                                    129

```
 1        A    No.

 2        Q    And the last column all the way to the right

 3   is Initials.

 4        A    That's whoever the door girl was that day.

 5        Q    The door girl is the person that does this?

 6        A    Yes, that's the girl.  Yes, that's the person.

 7        Q    The house mom does it?

 8        A    No, that's the door girl does this.

 9        Q    Who is the door girl?

10        A    I have no idea.

11        Q    Not the person, but what's -- what position is

12   that?

13        A    The person at the front door who checks ID's

14   and takes money for entry.

15        Q    How do they get paid?

16        A    They get paid out of this too.

17        Q    They get paid out of the house fees also?

18        A    Yeah.

19        Q    So, we are talking about the security, the

20   house mom, and the DJ getting paid out of the house fee,

21   and in addition to that there is the door girl?

22        A    Yes.

23        Q    How much does the door girl get of the house

24   fees?

25        A    She gets $50.  We take $50 out of there and
```

1    pay her for that.

2         Q    Does she also get tipped out?

3         A    No.  She gets tips from the customers, not

4    from the dancers.  She has a tip jar at the front door

5    that the customers can tip if they want to.

6         Q    What percentage of the house fees does she

7    get?

8         A    $50.

9         Q    Flat fee, $50?

10        A    Flat fee.

11        Q    Does she get any other kind of pay, any

12   directly just from the club?

13        A    No, just that, and the tip she gets from the

14   customers.

15        Q    Looking down there is a box in the lower

16   left-hand corner.  It says Cash Register.  Do you see

17   that?  There is ones, fives, tens, twenties.

18        A    That's what they started the register off

19   with.

20        Q    That is in the till at the beginning of the

21   night?

22        A    Yeah.

23        Q    Is that the same thing every night, 440?

24        A    It varies but usually it's around the same

25   thing every night.

Darnell Gardner
January 30, 2017                                          135

```
 1        Q    Is there a check-out procedure at the end of
 2   the night?
 3        A    No, they go around and they tip their house
 4   mom.  They tip their DJ.  They tip the security people
 5   and then they leave.
 6        Q    Is there any record that Toppers or you keep
 7   of the tip-outs at the end of the night?
 8        A    No, I don't handle any of that.
 9        Q    Who handles that?
10        A    They either tip the person themselves, or they
11   will hand it to the house mom to tip them for them.
12        Q    For the house mom to give everyone else the
13   money?
14        A    Yes, correct.
15        Q    And the house mom doesn't keep any records of
16   that?
17        A    I'm not sure.  You would have to ask the house
18   mom.
19        Q    If, for example, someone's tipping out the DJ
20   and they have made more than $10, or ten percent of
21   their tips equals more than $10, I think you said
22   earlier that the tip-out is supposed to be -- your rule
23   is they have to tip out the --
24        A    -- ten percent --
25        Q    -- or $10, whichever is greater?
```

Darnell Gardner
January 30, 2017                           136

 1       A    Correct.

 2       Q    Who's ensuring that $10 is less than ten

 3   percent?

 4       A    Nobody.  We don't -- we have no idea what

 5   girls make, so it's on the honor system.

 6       Q    Okay.  And then you're not aware of any

 7   records that are kept of what they were actually tipped

 8   out?

 9       A    They may.  I'm not sure.

10       Q    I'm going to show you what has been marked as

11   Exhibit J for the purpose of your deposition.  It's

12   Defendant's Bates stamp 451 through 456.

13            MR. McARTHUR:  Do we have an I?

14            THE WITNESS:  Yes.  Check-In sheet.

15            MR. McARTHUR:  Okay.

16            (Plaintiff's Exhibit No. J was marked for

17       identification.)

18   BY MR. FRISCH:

19       Q    Do you recognize the documents depicted in --

20   or the documents that are Exhibit J?

21       A    Vouchers.

22       Q    These are the vouchers that we were talking

23   about before?

24       A    Yes.

25       Q    So, take me through again, what do the

Darnell Gardner
January 30, 2017                                    139

1   out of the building.

2        Q    In absence of the records, it's fair to assume

3   that people worked whatever time they got there --

4        A    They worked until 2:00.

5        Q    They worked until 2:00 approximately?

6        A    Yeah.

7        Q    Okay.  That's every girl, every shift?

8        A    Correct.

9        Q    We talked earlier about you said in response

10  to this lawsuit, you required each of the entertainers

11  that was currently employed or currently working at the

12  club to sign a new contract in or about February of

13  2016?

14       A    Correct.

15       Q    Other than that, have you made any other

16  changes in response to the lawsuit?

17       A    No.

18       Q    After learning all the different clubs you

19  said you had been at -- I think you said it was after

20  this lawsuit was when you learned that many of the other

21  clubs --

22       A    Going through the same thing.

23       Q    -- have gone through the same thing, correct?

24       A    Correct.

25       Q    Those clubs, for the most part -- have you

Darnell Gardner
January 30, 2017                          140

1    learned the results of any of those cases?

2        A    Pretty much business as usual except I think

3    Cheetah might be doing something different.  I'm not

4    positive.

5        Q    Do you know what they are doing differently?

6        A    I think they made everybody employees.

7        Q    Have you done anything with regard -- other

8    than what we talked about before -- to giving people the

9    choice to become independent contractors or employees?

10       A    No.

11       Q    Have you done any further investigation as to

12   whether that's appropriate under the law?

13       A    No.

14       Q    That's even after the lawsuit and knowing

15   about all the other clubs?

16       A    Right.  I talked to one of the managers at the

17   Pink Pony who gave me a copy, when he shouldn't have, of

18   their dancer contract.  So I basically modeled mine off

19   of theirs.

20       Q    Have you talked to -- other than the change in

21   the paperwork, have you talked to anyone at any of the

22   clubs who, for example, Cheetah, you said you understand

23   that they have reclassified people?

24       A    That's just through word of mouth.  I haven't

25   talked to anybody at the Cheetah.

Darnell Gardner
January 30, 2017                          141

```
 1        Q    But it's your understanding that at Cheetah
 2   they have reclassified people who were previously
 3   treated as independent contractors, they have now
 4   classified them as employees?
 5        A    That's what I heard.
 6        Q    But you haven't investigated why they did
 7   that?
 8        A    No.
 9        Q    And you haven't done that yourself?
10        A    No.
11        Q    Have you heard -- I know you said you worked
12   in Las Vegas for a couple years.
13        A    Yes.
14        Q    Have you followed up to see if any of the
15   clubs in Las Vegas are doing anything differently?
16        A    I think they are still running status quo.
17        Q    Have you actually looked in to see --
18        A    I will be there this weekend, I will.
19        Q    Business trip?
20        A    Super Bowl with business on the back end of
21   it.
22             (Plaintiff's Exhibit No. K was marked for
23        identification.)
24   BY MR. FRISCH:
25        Q    I'm showing you what has been marked as
```

Darnell Gardner
January 30, 2017                        147

```
1

2                    C E R T I F I C A T E

3      STATE OF FLORIDA

4      COUNTY OF FULTON

5

6            I, Cynthia Hopkins, Registered
       Professional Reporter and Notary Public in and for
7      the State of Florida at Large, do hereby certify
       that the aforementioned witness was by me first duly
8      sworn to testify the whole truth; that I was
       authorized to and did report said deposition in
9      stenotype; and that the foregoing pages numbered 1
       to 147 are a true and correct transcription of my
10     shorthand notes of said deposition.

11           I further certify that said deposition was
       taken at the time and place hereinabove set forth
12     and that the taking of said deposition was commenced
       and completed as hereinabove set out.

13
             I further certify that I am not an attorney or
14     counsel of any of the parties, nor am I a relative or
       employee of any attorney or counsel of any party
15     connected with the action, nor am I financially
       interested in the action.  The foregoing certification
16     of this transcript does not apply to any reproduction of
       the same by any means unless under the direct control
17     and/or direction of the certifying reporter.

18

19           Dated this 5th day of February, 2017.

20

21           _____

22           Cynthia Hopkins, RPR, FPR

23           Job #1520881

24

25
```