# EXHIBIT E

Christie Burrell
February 06, 2017

```
              IN THE UNITED STATES DISTRICT COURT
                 MIDDLE DISTRICT OF GEORGIA
                       ATHENS DIVISION


CHRISTIE BURRELL, individually,      )
and on behalf of all others          )
similarly situated,                  ) CIVIL ACTION
                                     ) FILE NO.:
           Plaintiff,                )
                                     ) 3:15-CV-125-CDL
v.                                   )
                                     )
TOPPERS INTERNATIONAL, INC.,         )
a domestic profit corporation,       )
DARNELL LEWIS GARDNER, individually, )
and SANDRA GARDNER, individually,    )
                                     )
           Defendants.               )
```

DEPOSITION OF CHRISTIE BURRELL,

taken at the instance of the Defendants, pursuant to

stipulations contained herein, before Julie Breedlove,

Certified Court Reporter, at 10:30 a.m., on February 6,

2017, at 191 Peachtree Street, Northeast, Suite 4200,

Atlanta, Georgia.  The reading and signing of the deposition

were reserved.

```
 1                    A P P E A R A N C E S

 2

 3    FOR THE PLAINTIFFS:

 4    Andrew Frisch, Esquire
      Morgan & Morgan, PA
 5    600 N. Pine Island Road, Suite 400
      Plantation, Florida 33324
 6    (954) 318-0268
      E-mail: afrisch@forthepeople.com
 7

 8    FOR THE DEFENDANTS:

 9    John Jay McArthur, Esquire
      McArthur, McArthur & Overend, LLP
10    Post Office Box 893
      Athens, Georgia 30603
11    (706) 353-7736
      E-mail: john@mcarthurlaw.net
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1   It was the closest.
2       Q    All right.  How did you hear about Toppers?
3       A    Looked it up -- internet.
4       Q    And what did you do after you looked it up?  Did you
5   call for an appointment or what?
6       A    No -- walked in.
7       Q    And tell us what happened when you walked in.
8       A    I did an audition that night.
9       Q    What did the audition comprise?
10      A    Three songs on stage -- three -- dancing on stage for
11  one stage set.
12      Q    Who auditioned you?
13      A    Who judged?
14      Q    Uh-huh (affirmative).
15      A    Kelly -- house mom.
16      Q    That would be Kelly Gardner?
17      A    Yes.
18      Q    Did you see Sandra during that audition -- Sandra
19  Gardner?
20      A    No.
21      Q    Did you see Donny Gardner during the audition?
22      A    No.
23      Q    What were you told after the audition?
24      A    I was hired.
25      Q    Who told you that?

1    A    Kelly.
2    Q    That very night?
3    A    Yes.
4    Q    And did you complete a job application at that point,
5    or did you do that before the audition?
6    A    It was after.  You do the application after the
7    audition.  Audition first.  This -- you do this (indicating)
8    the independent contract agreement, after you're hired.
9    Q    Did you do it that same night?  Did you sign that the
10   same night?
11   A    I don't remember.
12   Q    Okay.  Did you begin work immediately?
13   A    By immediately, within the next day or couple of
14   days.  Yes.
15   Q    Not that night?
16   A    Not that night.
17   Q    But soon after that?
18   A    Right.
19   Q    Had you ever worked in a strip club before then?
20   A    No.
21   Q    Tell me, if you recall, how the interview with Kelly
22   went before you did the audition.  Did you and she -- just give
23   us some detail about that, what you talked about and your
24   questions.
25   A    She asked me why I wanted to dance, and I said money.

1   Q   Do you remember when you left and when you came back?
2   A   I left in 2015 over the summer due to very large
3   amounts of bug bites, basically, when I was out in the woods.
4   And there was no -- tick bites, actually. So, yeah, it was
5   bad. So my body basically was covered in bites, so I had to
6   take a very long time off for that reason. Before that, there
7   was a period of time I went through really bad anxiety that was
8   a couple of months off. I don't remember what period of time
9   that was. That's all I can remember.
10  Q   Did you receive medical treatment for the tick bites?
11  A   No.
12  Q   Did you receive any treatment for your anxiety that
13  caused you to leave work?
14  A   Yes.
15  Q   Where was that? What was that?
16  A   Dr. Heinz, my psychiatrist.
17  Q   Are you still seeing him?
18  A   Yes.
19  Q   Have you ever been hospitalized for anxiety-related
20  issues?
21  A   Yes.
22  Q   When was that?
23  A   Right after I turned 25.
24  Q   And that would have been --
25  A   Spring -- late spring of 2015.

1    Q    So you're 26 now?
2    A    Yes.
3    Q    Be 27 --
4    A    April.
5    Q    When you would leave work at Toppers, would you have
6  any problems coming back, or were they glad to have you back?
7    A    I didn't run into any problems.
8    Q    Okay.  When you first went to work there, what was
9  your understanding regarding compensation?
10   A    Tips -- just tips.
11   Q    Tips from the customers?
12   A    Right.
13   Q    Did Toppers ever pay you any money?
14   A    No.
15   Q    Tell me about your understanding regarding house fees
16 and tipping out.
17   A    House fees depend on when you get there, and tip-out
18 is -- they set minimum and more if you made more.
19   Q    Was there a requirement of tipping out?
20   A    Yes.
21   Q    Or was that up to you?
22   A    No, it was a requirement.
23   Q    Do you recall the minimums?
24   A    DJ is $10 minimum or 10 percent, whatever is larger.
25 It would change for the others.  It would change for house moms

```
 1  and bouncers.  Sometimes five minimum, sometimes --
 2       Q    Five dollars minimum?
 3       A    Yes.  Sometimes ten minimum.
 4       Q    Ten dollars?
 5       A    Yes.  It would depend on weekdays versus weekends,
 6  and it would also change at different periods of time.
 7       Q    You mean from time to time during the year, or from
 8  time to time at night?
 9       A    During the year, but not, like, regularly due to,
10  like, seasons or anything.  Just -- I wouldn't say randomly,
11  but given whatever situation was happening at the time.
12       Q    You referred to a percentage of your tips.  Who would
13  know how much you received in tips at night?
14       A    They could keep up with it through your back room
15  dances, your executive dances.  Floor dances are -- you can't
16  really keep up with those.  Stage tips -- can't really keep up
17  with them, like, in a definite manner.  But you could
18  through -- like, if you go to the executive, it's, like,
19  written down.  If you go to the VIP, it's written down.
20       Q    Did you keep any record of what you received in tips?
21       A    No.
22       Q    What would you make on an average weeknight?
23       A    Between -- really, it varied so much.  It could go
24  anywhere from walking out owing -- not owing money, but, like,
25  in the negative, to walking out with, like, 500.  I mean,
```

1  there's many factors that went into how much you made.
2      Q    What's the most you ever made in one night -- tips?
3      A    Fourteen hundred before tip-out.  That was a game
4  day.
5      Q    Was that common for game days?
6      A    Over a thousand is typically common for game days.
7      Q    So I take it game days were the biggest?
8      A    They were.
9      Q    And those would be days in which the University of
10 Georgia football team played at home?
11     A    Right.
12     Q    On a weeknight -- I'm sorry, on a weekend night that
13 wasn't a game day, what would you typically make?
14     A    Weekend night?
15     Q    Uh-huh (affirmative).
16     A    Between 2- to 500, on average.
17     Q    And again, it would vary, of course?
18     A    Extremely.
19     Q    Did you keep any sort of record of what you received
20 from time to time?  Did you write it down, or --
21     A    No.
22     Q    So you don't have any way of knowing what you may
23 have made while you were working at Toppers?
24     A    I didn't write it down.  I remember, like, nights
25 when I would make 500 and be very happy.  There's no written

1  record.
2      Q    Did you report any of this income you made in tips at
3  Toppers for income tax purposes?
4      A    Yes.
5      Q    How did you know what amount?
6      A    I calculated what would have been the average, just,
7  like, overall, and based off of that.
8      Q    Have you filed income tax returns for 2013?  If you
9  don't recall, that's --
10     A    Let's go with that -- don't recall.
11     Q    What about 2014?
12     A    Also don't recall.
13     Q    And 2015?
14     A    Don't recall.
15     Q    Did you maintain any bank accounts during the time
16  you worked at Toppers?
17     A    Yes.
18     Q    Where?
19     A    Wells Fargo.
20     Q    One account or more than one?
21     A    No, just one.
22     Q    And where did you generally bank -- there in Athens?
23     A    Yes.
24     Q    Which branch -- the one downtown?
25     A    Probably the east side.

1    Q    Do you still maintain an account there?
2    A    Yes.
3    Q    Is it joint with someone else, or is it mainly your
4  account?
5    A    It's mine.
6    Q    Would you deposit your tips from customers at Toppers
7  into that bank account?
8    A    From time to time.
9    Q    Did you just keep some of the cash and use cash?
10   A    Right.  Yeah, I did not put any in regularly.
11   Q    What did you use the checking account for?
12   A    Buying things online, paying bills, anything that's
13  required for a card.
14   Q    And I assume you had a debit card and/or credit card
15  with that account?
16   A    Right.
17   Q    During the time you worked at Toppers, did you have
18  any other bank accounts anywhere else?
19   A    No.
20   Q    Any other debit or credit cards?
21   A    No.
22   Q    Tell me how you would know when nights to work at
23  Toppers.  How would that process go?
24   A    There was a schedule.
25   Q    How did the schedule work?

1    A    Depended.  Like, at the beginning it was three times
2  a week.  Later on it was four times a week, and the rules
3  changed a lot with the schedule.
4    Q    Tell me how.
5    A    Some days you would have to be there by a certain
6  time such as 7:00 no matter what, and then some days you could
7  say whether you wanted to be there 7:00, 8:00, 9:00, or 10:00.
8  At some points in time, Fridays would be required.  Later on,
9  Fridays would be required before the game day -- Saturdays.
10   Q    Could you pick the nights you wanted?
11   A    Depended.  Sometimes.
12   Q    On what?
13   A    Within a range.  There was at least one Monday out of
14 the month you had to work at one point in time.  You needed to
15 work a Monday, Tuesday, or Wednesday to work a Friday or a
16 Saturday.
17   Q    Could you work as many nights as you wanted to?
18   A    Yes.
19   Q    Were you prohibited from working anywhere else while
20 you were working at Toppers?
21   A    Not prohibited, no.
22   Q    Did you work anywhere else while you were working at
23 Toppers?
24   A    No.
25   Q    Have you ever danced at any other dance club?

1  A   On some weeks you may not be allowed to work the rest
2  of the week.  On other weeks, it was fine.  It just depended.
3      Q   Did you have any regular customers?
4      A   Yes.
5      Q   For you, personally, I mean?
6      A   Regular?  No one's ever for you personally.  They can
7  always get a dance with someone else.  But regular, would come
8  in regularly, yeah, and spend money with you regularly.
9      Q   Did you ever advertise with anyone that you would be
10 dancing at Toppers?
11         MR. FRISCH:  Objection -- vague.
12 BY MR. MCARTHUR:  (Resuming)
13     Q   Did you ever promote yourself as a dancer at
14 Toppers -- for example, by newspaper ad?
15     A   Oh, no.
16     Q   By radio ad?
17     A   No.
18     Q   Would you ever call up potential customers or
19 customers and say, hey, I'm going to be working Thursday night
20 from 9:00 until, for example?
21     A   No.
22     Q   How would you -- did you ever promote yourself as a
23 dancer at Toppers?
24         MR. FRISCH:  Objection -- vague.
25

```
 1   BY MR. MCARTHUR:  (Resuming)
 2        Q     You can go ahead and answer if you can.
 3        A     No.
 4        Q     You never did?  Did you ever provide your own
 5   costumes?
 6        A     Yes.
 7        Q     Did Toppers ever provide you any costumes?
 8        A     No.
 9        Q     Were you given direction as to what sort of costumes
10   to wear?
11        A     Yes.
12        Q     And tell me what those directions were.
13        A     Those varied.  Always heels.  Heels, G string, and if
14   there was a particular outfit not liked, then that may be
15   called out and be told to take it off.  Makeup and hair done.
16        Q     Were you ever told that a particular outfit you wore
17   was unsuitable?
18        A     Yes.
19        Q     And who would call you out on that?
20        A     The house mom.
21        Q     What were the requirements on hairstyles and makeup?
22        A     Makeup -- lipstick was important.  Depended on the
23   house mom.  Eye makeup was very important with one.
24        Q     Who?
25        A     Kelly.
```

1     Q    Anything else in particular?
2     A    Hair just had to be done.  I mean, you could have it
3  straight or you could have it curly, up or down, but -- as long
4  as it was within rules.  I know certain hair colors weren't
5  allowed.  Dreads were not allowed.  I think cornrows were not
6  allowed -- like, braids.
7     Q    Were you ever disciplined while working at Toppers?
8          MR. FRISCH:  Objection -- vague as to what -- can you
9     describe what disciplined means?
10 BY MR. MCARTHUR:  (Resuming)
11    Q    Did any of the management at Toppers ever require you
12 to pay a fine for some infraction of the rules?
13    A    I typically would not receive a fine.  It would be
14 verbal warning.  But fines were there for certain instances if
15 certain rules were broken.
16    Q    Such as?
17    A    If you left the stage before your stage set was up,
18 that was a fine.  If you were a no-call, no-show, that's a
19 huge, huge fine.  Fights -- if you got into a fight, that's a
20 fine.  There's many to remember.
21    Q    Were you ever fined?
22    A    My official answer is I don't recall.
23    Q    You do not recall whether you were ever fined?
24    A    Right.  I do not believe I was.  I might be wrong.  I
25 don't recall.

```
 1      Q    Do you know why you were never fined?
 2      A    I typically followed the rules.
 3      Q    Okay.  Are you familiar with other dancers being
 4   fired for rule infractions?
 5      A    Yes.
 6      Q    Who would impose the fines?
 7      A    The house moms, sometimes DJ.
 8      Q    Did you ever know of any occasion upon which Sandra
 9   Gardner imposed a fine on anyone?
10      A    Personally, no.  That's each dancer's business, not
11   mine.
12      Q    But you don't know of any occasion --
13      A    I don't, personally, no.
14      Q    Do you recall any dancers being fired?
15      A    Yes.
16      Q    How many?
17      A    Over the course of the years I was there, I wouldn't
18   remember how many.
19      Q    Who would do the firing?
20      A    That -- I've seen a bouncer do it.  I've seen the DJ
21   do it.  I've seen a house mom do it.
22      Q    Have you ever seen Sandra fire anyone -- Sandra
23   Gardner?
24      A    Backroom -- I cannot give a definitive answer on
25   that.  I want to say yes, but I don't want to give an
```

1  untruthful answer.  So I'm going to go with don't recall.
2       Q    To the best of your recollection, what do you recall?
3       A    I would like to say yes, I've seen at least one
4  incident.  But I do not recall the specific incident, so. . .
5       Q    Okay.  You don't remember who it was?
6       A    No.
7       Q    Do you remember what the infraction was?
8       A    Typically Sandra would only go back there if it got
9  bad with something, so it would be, like, maybe a fight or
10 something.
11      Q    And the backroom -- do you mean the --
12      A    Dressing room.
13      Q    Dressing room.  Okay.  How did you see the duties of
14 the house mothers, generally -- house moms?
15           MR. FRISCH:  Objection -- vague.
16 BY MR. MCARTHUR:  (Resuming)
17      Q    You can go ahead and answer.
18      A    They were dancer managers.
19      Q    Specifically, what would they do?
20      A    That would help you with outfits and hair.  They do
21 your schedule.  Hiring, firing, typically.
22      Q    Would they provide snacks for you?
23      A    Not regularly.
24      Q    How about toiletries?
25      A    If a particular one happened to go out of their way

1  STATE OF GEORGIA

2  COUNTY OF GWINNETT

3  WITNESS:  CHRISTIE BURRELL

4       Pursuant to Article 8.B of the Rules and Regulations of

5  the Board of Court Reporting of the Judicial Council of

6  Georgia, I make the following disclosure:

7       I am a Georgia Certified Court Reporter.  I am here as an

8  independent contractor to US Legal Support, Inc.

9       US Legal Support, Inc. was contacted by the offices of

10 McArthur, McArthur & Overend, LLP, to provide court reporting

11 services for this deposition.  The firm will not be taking this

12 deposition under any contract that is prohibited by OCGA

13 15-14-37(a) and (b).

14      US Legal Support, Inc. has an agreement to provide court

15 reporting services with McArthur, McArthur & Overend, the terms

16 of which are as follows:  Any and all special rates and/or

17 services are available to all parties involved in this

18 litigation.

19      I am not disqualified for interest, personal or financial,

20 under OCGA 9-11-28(c).

21      This, the 6th day of February 2017.

22                                        Julie Breedlove
                                     Certified Court Reporter
23                                   Georgia Certificate No. 2864

24

25

```
 1                    C E R T I F I C A T E

 2   STATE OF GEORGIA

 3   COUNTY OF GWINNETT

 4       I hereby certify that the foregoing deposition was taken

 5   down by me and that the foregoing transcript is a true and

 6   correct record given to the best of my ability.

 7       The above certification is expressly withdrawn upon the

 8   disassembly or photocopying of the foregoing transcript, unless

 9   said disassembly or photocopying is done under the auspices of

10   US Legal Support, Inc. and the signature and original seal is

11   attached thereto.

12       I further certify that I am not a relative, employee,

13   attorney, or counsel of any of the parties; nor am I

14   financially interested in the action.

15       This, the 15th day of February 2017.

16
                   [signature: Julie Breedlove]
17       _____

18       Julie Breedlove
         Certified Court Reporter
19       Georgia Certificate Number 2864

20

21

22

23

24

25
```