# EXHIBIT F

1              UNITED STATES DISTRICT COURT
               MIDDLE DISTRICT OF GEORGIA
2                  ATHENS DIVISION

3           CIVIL ACTION NO.: 3:15-cv-0012-CDL

4

5
    CHRISTIE BURRELL, individually, and on
6   behalf of all others similarly situated

7

8              Plaintiff,

9   -vs-

10
    TOPPERS INTERNATIONAL, INC., a
11  Domestic Profit Corporation, DARNELL
    LEWIS GARDNER, individually, and
12  SANDRA GARDNER, individually,

13             Defendants.
    _____
14

15            DEPOSITION OF SANDRA GARDNER

16
               Monday, January 30, 2017
17                  3:42 - 4:37 p.m.

18

19          191 Peachtree Street Northeast
                    Suite 4200
20             Atlanta, Georgia 30303

21

22

23  Reported By:
    Cynthia Hopkins, RPR, CCR
24  Notary Public, State of Georgia
    U.S. Legal Support
25  Job #1520881

Sandra Gardner
January 30, 2017                                    2

```
 1   APPEARANCES:

 2   On behalf of the Plaintiff:

 3       ANDREW R. FRISCH, ESQUIRE
         MORGAN AND MORGAN, P.A.
 4       600 North Pine Island Road
         Suite 400
 5       Plantation, Florida  33324
         Phone:  954.327.3013
 6

 7

 8   On behalf of the Defendants:

 9       JOHN JAY MCARTHUR, ESQUIRE
         McARTHUR, McARTHUR & OVEREND, LLP
10       269 North Jackson Street
         Athens, Georgia  30603
11       Phone: 706.353.7736

12

13

14

15   ALSO PRESENT:

16       DARNELL GARDNER

17

18

19

20

21

22

23

24

25
```

Sandra Gardner
January 30, 2017                                    10

```
 1        A    No.
 2        Q    So you agree that as a house mom, when you're
 3   the house mom, it's your responsibility to audition new
 4   girls?
 5        A    Yes.
 6        Q    And as a house mom, when you audition people,
 7   you're making the initial decision as to whether someone
 8   is hired or they get the probationary -- they are hired
 9   for that probationary period?
10        A    I rate them and I let Darnell see it.
11        Q    See what?
12        A    What my rating is of the girl, of the audition
13   decision.
14        Q    Okay.  What is your rating system?
15        A    One to ten.
16        Q    Okay.  And if you have a rating -- is there a
17   specific number, if someone is a seven, are they going
18   to get that probationary hire?
19        A    Chances are, yes.
20        Q    Is there some number -- I'm assuming if they
21   are a one, their future is not looking too bright as an
22   entertainer at Toppers?
23        A    That is correct.
24        Q    At what point do they get to the number when
25   it's presumably that they are going to get the
```

Sandra Gardner
January 30, 2017                                    11

1   opportunity?

2        A    It's based on several things:  Appearance,

3   movement, looks as far as on the stage how they look.

4        Q    Right.  High heels, wear high heels?

5        A    I like that, yes, yes.

6        Q    Okay.  And so you're taking all those things

7   into account when you're assigning a number one to ten?

8        A    Yes.

9        Q    The closer it gets to ten, the more automatic

10  it is they are going to get hired?

11       A    Absolutely.

12       Q    But you're making that initial judgment and

13  recommendation to Darnell about whether they should be

14  hired?

15       A    Yes.

16       Q    That's something that you have always done, at

17  least in the context of being a house mom?

18       A    Yes.

19       Q    Going back at least since 2004 when you --

20       A    Gave it up.

21       Q    Right.

22       A    Yes.

23       Q    Does Darnell usually defer to you with regard

24  to people you think should be hired?

25       A    No, it's vice versa usually.

Sandra Gardner
January 30, 2017                              13

1    do the money?

2         A    Yes.

3         Q    On those one or two occasions a month what are

4    you doing at the club?

5         A    Going to talk to Darnell.

6         Q    And you go there because you know he is going

7    to be there?

8         A    Yes.

9         Q    How long are you typically there for those one

10   to two times a month?

11        A    An hour, hour and a half.

12        Q    Do you talk to any of the entertainers when

13   you're there?

14        A    Yes.

15        Q    What kinds of things do you talk about with

16   the entertainers?

17        A    They will come up and say hello, talk to me

18   and tell me what's going on.

19        Q    Do you ever give them pointers, tell them,

20   hey, you should be doing this, or you should be doing

21   that or this is the right way to do it?

22        A    If they ask, I will give them an opinion.

23        Q    What types of things are we talking about that

24   you will give them pointers about?

25        A    Usually it's female gossip stuff when I say

Sandra Gardner
January 30, 2017                                  14

1    that:  A girl took my outfit, what do I do, how do I get

2    it back; what do you think about this outfit.  It's just

3    pretty, you know, very light talk.  Girl stole my

4    customer, those kinds of things.

5         Q    As house mom do you make any kind of

6    recommendations to Darnell or anyone else about people

7    that should such be terminated in your opinion?

8         A    If there is an issue, I do tell him what the

9    issue is.  And usually I will tell the girl if she says

10   something to me, I say I will have to talk to Donny.  We

11   call him Donny.  We don't call him Darnell.  I have to

12   talk to him, and then I will talk to him and I will

13   let -- you know.

14        Q    And in those circumstances do you make a

15   recommendation to him as to, hey, this girl has been

16   doing this?

17        A    I give him the conversation and then if I have

18   any background, then I give it to him.

19        Q    And you say:  I think it's time to get rid of

20   her or I think we should give her one more chance, stuff

21   like that?  Is that --

22        A    Yes.

23        Q    Are those the conversations that you have with

24   him?

25        A    Right.  Yes.

Sandra Gardner
January 30, 2017                                    15

```
 1        Q     Does he typically defer to you on your
 2   opinions, on your recommendations regarding people's
 3   terminations?
 4        A     50/50.
 5        Q     50/50.  Are you involved in scheduling of the
 6   girls?
 7        A     Yes.  When I'm there, yes.
 8        Q     You are.  How about when it was less frequent
 9   that you're working as the house mom three or four years
10   ago, were you also involved in scheduling the girls on
11   the days that you were working?
12        A     No, no.
13        Q     When did you begin scheduling the girls again?
14        A     When I just -- a little less than a year ago
15   when I stepped in to help as house mom.
16        Q     When was that?
17        A     That was last, early part of 2016.
18        Q     Have you always had the power, to the extent
19   that you were the house mom, to issue fines if people
20   broke rules?
21        A     No.  Since I have been there --
22        Q     Right.
23        A     -- if there is dramatic violations then, like
24   things that are against the law --
25        Q     Right.
```

Sandra Gardner
January 30, 2017                                    16

```
 1        A     -- then that would be -- I would have
 2   something to say about that.
 3        Q     And you would, you would fine the entertainer?
 4        A     I would give them the option.
 5        Q     Of what?
 6        A     Either leaving for the night if they violated
 7   the law, or you can pay a fine.  Pretty much those are
 8   the two options.
 9        Q     Okay.  When we're talking about violating the
10   law, prostitution, underage drinking?
11        A     Yes, yes.
12        Q     All of the above?
13        A     Yes.
14        Q     What else?
15        A     Doing things they shouldn't do.
16        Q     Like what?
17        A     In the executive.  Pretty much that's it.
18   Stepping over -- the way that the stage is, it has a lip
19   and you're not supposed to go over that lip, so if you
20   do go over the lip to put yourself in close contact with
21   the customer, that's against the law.
22        Q     Okay.  And if you -- if you find out that
23   someone has done that, they have gone closer than the
24   lip of the stage, you give someone the option, either
25   the club will fine them or they get sent home for the
```

Sandra Gardner
January 30, 2017                                    17

1   day?

2        A    Yes.

3        Q    Okay.  And if they pay a fine, are they just

4   permitted to keep working?

5        A    Well, that depends on the violation.  If it's

6   a big violation, I'm going to talk to my son about it.

7        Q    Like what's a big violation versus a little

8   violation?

9        A    Sexual contact in the executive room.

10       Q    Okay.  What is a little violation?

11       A    Being intoxicated is not as bad.  It's bad,

12   but not as bad as an example.

13       Q    And I was under the impression, maybe I'm

14   mistaken, in the executive room it's just the girl and

15   the patron; is that right?

16       A    Correct.

17       Q    How would you know if there is sexual contact?

18       A    Cameras.

19       Q    Are there cameras in there also?

20       A    Yes.

21       Q    Is it the house mom that views the camera

22   feeds --

23       A    Yes.

24       Q    -- during the show?

25       A    Yes.

Sandra Gardner
January 30, 2017                                          20

1        A    No, basically the same.

2        Q    Back then you made recommendations to Darnell

3    about hiring people?

4        A    Correct.

5        Q    And you do that now too?

6        A    Correct.

7        Q    Back then you made recommendations for

8    terminating people, right?

9        A    Right.

10       Q    That's something you still do now?

11       A    Yes.

12       Q    Back then you had the authority and you fined

13   people for certain offenses, right?

14       A    No.

15       Q    You never did that?

16       A    No, I never had the authority to do that.

17       Q    What -- so when you were working one to two

18   times a week, you couldn't fine anyone?

19       A    I have more responsibility now than I did back

20   then.

21       Q    So, if you -- so, something that a house

22   mom -- are there certain things, fineable offenses, that

23   the house mom is responsible for fining people for?

24       A    Yes.  And those are the intoxication, bad

25   conduct in the private rooms, fighting.

Sandra Gardner
January 30, 2017                              21

```
1        Q    Fighting or biting?

2        A    Fighting, altercation.

3        Q    Okay.

4        A    Those types of things.

5        Q    So if those things happened, those are

6   fineable offenses, you're saying the house mom is

7   responsible for fining these people if she becomes aware

8   of that?

9        A    Yes.

10       Q    Okay.  Was the house mom not responsible for

11  fining people if she became aware of it three or four

12  years ago?

13       A    Well, it always went to Darnell since he has

14  taken over.

15       Q    Okay.

16       A    We always have to run that by him and that's a

17  phone call.  If something happens, pick up the phone.

18  We call him.  This is what's happening, what do you

19  think; this is what I suggest, and then he determines.

20       Q    He makes the final determination?

21       A    Yes.

22       Q    So that's what it is now or that's what it

23  used to be?

24       A    It's been that way since 2004, since he's

25  taken over.
```

Sandra Gardner
January 30, 2017                          23

```
 1    the conduct.

 2         Q     What do you mean?

 3         A     Conduct in private rooms.

 4         Q     Anything else?

 5         A     That's pretty much it.

 6         Q     Are there records that indicate who the house

 7    mom was on any given shift?

 8         A     I don't think so.  There may be.  I don't

 9    think there is now.

10         Q     So currently, like, we couldn't look at a

11    record -- you may know who the house mom was

12    yesterday -- yesterday was Sunday, so you guys were

13    closed.  But the day before, Saturday, is there any

14    record we could look at, a written record that we could

15    say the house mom was you or the house mom was someone

16    else?

17         A     No, there is nothing written.

18         Q     Has there ever been any kind of a written

19    document to indicate who has been the house mom on any

20    given shift?

21         A     I don't think so.

22         Q     You heard extensive testimony from Darnell

23    this morning and this afternoon about the tip-outs.

24         A     Correct.

25         Q     He testified that the house moms get tipped
```

Sandra Gardner
January 30, 2017                    24

```
 1   out, DJ's get tipped out, security gets tipped out, and
 2   then the door girl gets tipped out, right?
 3        A     Correct.
 4        Q     Do you agree with all that?
 5        A     Yes.
 6        Q     That's how it's always been as far as you
 7   know?
 8        A     Yes.
 9        Q     Are you aware of any records that the club
10   keeps or that the house moms keep or anyone keeps of the
11   amounts of money that are tipped out to any individuals
12   on any shift?
13        A     The only ones, that would probably be the DJ's
14   themselves.
15        Q     DJ's keep records?
16        A     I would think they do.
17        Q     Have you ever seen those records?
18        A     I haven't seen the records.
19        Q     You're responsible, when you serve as house
20   mom on any shift, as part of collecting the tip-out,
21   right?
22        A     Well, the house fee.
23        Q     The house fee?
24        A     I divvy up the house fee because I have the
25   money there.  At the end of the night, there are
```

Sandra Gardner
January 30, 2017                              25

```
 1    envelopes for each entity.
 2         Q    Okay.  Do you keep records of the amount of
 3    house fees that you're divying up?
 4         A    No.
 5         Q    But you do keep records of who paid what, the
 6    amount of house fees in general, right?
 7         A    Yes.
 8         Q    And that's the sign-in sheet?
 9         A    Yes.
10         Q    We don't know who got the money in specific
11    amounts but we know who paid it in certain amounts?
12         A    Correct.
13         Q    And that's for every shift pretty much?
14         A    Every shift.
15         Q    As far as you know if someone pays a fine,
16    that's also listed on the sign-in sheet?
17         A    Yes.
18         Q    Prior to 1992 did you have any experience
19    running a nightclub?
20         A    No.
21         Q    Have you ever worked in the nightclub
22    business?
23         A    Yes.
24         Q    Or hospitality?
25         A    Yes.
```

Sandra Gardner
January 30, 2017                                        26

1        Q     Prior to 1992 had you?

2        A     Yes.

3        Q     Tell me about that experience.

4        A     I was a concert promotor.

5        Q     When was that?

6        A     That was in the early 80's, from '82 to like

7    '86.

8        Q     Where did you do that?

9        A     Anchorage, Alaska.

10       Q     What kinds of concerts did you promote?

11       A     Everything from Motley Crew to Barry Manilow.

12       Q     That's pretty tough to get people out of their

13   houses in the dead of winter in Alaska?

14       A     No, it was easy.

15       Q     They were happy to get out?

16       A     Yeah.

17       Q     Other than that, have you worked in any kind

18   of hospitality business or nightclub business prior to

19   1992?

20       A     No, other than my mom ran a restaurant.

21       Q     Did you work at the restaurant?

22       A     Yes.

23       Q     When was that?

24       A     Oh, my God, 1960, '64 to '67.

25       Q     Where was that restaurant?

Sandra Gardner
January 30, 2017                    29

1   police.  They were pretty much our security guards.

2       Q    How were they paid?

3       A    They were paid from the door at the end of the

4   night.

5       Q    How about at Insomnia, were there any people

6   that worked there besides you?

7       A    We had police officers there as well.

8       Q    Anyone else, any bartenders, any wait staff,

9   anything like that?

10      A    Yeah, we had two bartenders.

11      Q    Anyone else?

12      A    No.

13      Q    Was it all plastic also there?

14      A    Yes.

15      Q    How was security paid at Insomnia?

16      A    There were police.  They were paid a flat rate

17  per night.

18      Q    How about the bartenders?

19      A    The bartenders were paid -- they -- that's

20  where they had the business.  It was like a -- I forgot

21  the name, but they are like a group, like they go out

22  and bartend.  So they got paid at the end of the night a

23  flat rate.

24      Q    Either at the time it opened or at any time

25  after, up to and including the time that this lawsuit

Sandra Gardner
January 30, 2017                          30

1    was filed, did you ever inquire either by reading or by

2    speaking to anyone about whether the pay policies at

3    issue in this case were legal and complied with the FSLA

4    and Georgia state law?

5         A    In 1993 John Padgett, Padgett Business

6    Services was our accountant.  And they were the ones

7    that basically researched and told me about independent

8    contractors.

9         Q    What did they tell you?

10        A    That number one, you couldn't touch their

11   money; and number two, you couldn't tell them what to

12   do.  And I'm trying to remember everything that he did

13   tell me.  Couldn't touch their money.  Couldn't tell

14   them when to come in.

15             Pretty much I think that was it.  I

16   couldn't -- they had -- it had to be a business licensed

17   person.  In order to be a contractor, they had to obtain

18   a business license or have one.  And that was basically

19   how we started that.

20             He actually went to -- he is the one that

21   talked to the Department of Labor and the state, the

22   State of Georgia, as to how the club was going to

23   operate with independent contractors.

24        Q    Darnell testified earlier that when you

25   guys -- first of all, Darnell said that it was you and

Sandra Gardner
January 30, 2017                                      32

```
 1        Q    Well, do you know for sure or you're just
 2   guessing that's what happened?
 3        A    No, Padgett -- according to Padgett Business
 4   Services, they had done everything that they were
 5   supposed to do to have us qualify people that were there
 6   as independent contractors.
 7        Q    Well, did you -- what questions specifically
 8   did you ask Padgett about whether -- about independent
 9   contractors?
10        A    He basically told us what we had to do.  And
11   of course I had a few questions, but it boiled down to
12   we couldn't touch their money, because they made their
13   own money.  We couldn't -- there wasn't a whole lot we
14   could do.  If they wanted to leave, they could leave; if
15   they didn't want to come, they didn't have to come.  The
16   house fee is where we used that for paying the support
17   staff.
18        Q    Okay.  So let's talk about, have you had house
19   fees in place since 1993, so ever since you opened?
20        A    Yes.
21        Q    So you say the one thing that you learned from
22   Padgett was you couldn't touch their money to use your
23   words, right?
24        A    Well, the club couldn't touch their money as
25   far as doing things.  We could take the money -- as an
```

Sandra Gardner
January 30, 2017                            33

 1    example, we could take the house fees and divvy it up.

 2         Q    Okay.

 3         A    But as far as money that they made --

 4         Q    Right.

 5         A    Or anything, we couldn't charge them -- I

 6    mean, I'm trying to put this right.  We could not charge

 7    them.  Wait.  Let me back that up.  How did he say that,

 8    take their money.  We couldn't take their money if they

 9    decided to tip out or not tip out.  Okay.  That was

10    pretty much something we would have to work out with

11    them.  We couldn't say, we shouldn't say, you pay him

12    100 bucks.

13         Q    So, you knew from the very beginning in 1992

14    or 1993 that it was improper for you to tell people who

15    you treated as independent contractors, they had to pay

16    other people a specific amount of money?

17         A    We could tell them they should pay them.

18         Q    Right.

19         A    But we can't say you have to pay 100 bucks or

20    whatever.  We could tell them as I understand it back

21    then, that we could say, okay, in order to be fair, how

22    do you feel about -- and we set that up with the

23    entertainers:  What do you think is fair?  And they

24    actually set that parameter themselves.

25         Q    Well, you heard Darnell testify on behalf of

Sandra Gardner
January 30, 2017                              35

1    money to anyone, right?

2         A    That was how we set it up in the beginning,

3    yes.

4         Q    I'm not asking how it was set up at the

5    beginning.  You understood it was improper to set a

6    minimum amount of money or any amount of money that

7    someone has to pay someone else if they are treated as

8    an independent contractor?

9         A    Correct.

10        Q    Have you had house fees since the beginning?

11        A    Yes.

12        Q    House fees, you always understood that that

13   was the entertainers' money, right, before they give,

14   before they give it to the club?

15        A    Yeah.  That was a rental fee so-to-speak for

16   them to be there.

17        Q    Okay.  Has the house fee changed in any way

18   other than the amounts that are charged?

19        A    Yes.  Back then it was a flat rate.

20        Q    What was it back then?

21        A    Thirty bucks I believe it was.

22        Q    Was it still distributed to other people that

23   worked in the club?

24        A    Yes.

25        Q    Does the club keep any of the money now paid

Sandra Gardner
January 30, 2017                                    36

1    for the house fees?

2         A     No.

3         Q     So, it's all used to pay other people that

4    work in the club?

5         A     Correct.

6         Q     The entertainers have always tipped out other

7    people who work in the club, right?

8         A     Correct.

9         Q     And that's kind of the math set by the club,

10   the house fees?

11        A     That's an amount that's agreed upon.

12   Everything was agreed upon when we first opened.  It was

13   agreed upon in a mass meeting.

14        Q     Did you have some sort of -- when did you

15   change the house fees from a $30 flat fee to the tiered

16   system?

17        A     2000 -- it was $30 for a long time.  I believe

18   we started out a long time ago.  I believe Darnell

19   changed it when he took over based on what the standard

20   was.

21        Q     He made the unilateral decision, meaning he

22   made that decision by himself -- you heard his

23   testimony, right, that based on his experience that he

24   had working in some other clubs in Las Vegas, he thought

25   it was appropriate to have a tiered system, right?

Sandra Gardner
January 30, 2017                              38

```
 1        Q    It's not prudent to just ignore what the
 2   changes in the law may be, right, other changes in the
 3   law?
 4        A    I think you should try to stay aware, yes.
 5        Q    You also said one of the things that you
 6   understood from meeting with Padgett and the meeting
 7   with the DOL is that you couldn't tell people, if you
 8   were treating them as independent contractors, you
 9   couldn't tell them when to be at a certain place, right?
10        A    Well, you can ask them, but you can't tell
11   them.
12        Q    Okay.  So for example, you can't require the
13   people work a minimum of four days a week?
14        A    You can ask them if they can work a minimum of
15   four days a week.
16        Q    But you can't require them to.  That -- those
17   two things don't jive.  I mean, based on what you
18   learned from Padgett and the DOL, you understood you
19   couldn't require -- you could ask people to work four
20   days a week and suggest and hope that they do, but you
21   couldn't require that they do?
22        A    Correct.
23        Q    And you have known that ever since 1992 or
24   1993, right?
25        A    Yes.
```

Sandra Gardner
January 30, 2017                                    43

1                        CERTIFICATE OF OATH

2    STATE OF GEORGIA

3    COUNTY OF FULTON

4

5

6          I, the undersigned authority, certify that

7      SANDRA GARDNER personally appeared before me and

8      was duly sworn on the 30th day of January, 2017.

9

10         Witness my hand and official seal this 5th day

11      of February, 2017.

12

13

14

15
        _____
16      Cynthia J. Hopkins, RPR, CCR
        Notary Public - State of Georgia
17      My Commission Expires:  8/18/20
        My Commission No.:  W-00294280
18      Job #1520881

19

20

21

22

23

24

25

Sandra Gardner
January 30, 2017                                    44

```
 1

 2                        C E R T I F I C A T E

 3       STATE OF FLORIDA

 4       COUNTY OF FULTON

 5

 6               I, Cynthia Hopkins, Registered
         Professional Reporter and Notary Public in and for
 7       the State of Florida at Large, do hereby certify
         that the aforementioned witness was by me first duly
 8       sworn to testify the whole truth; that I was
         authorized to and did report said deposition in
 9       stenotype; and that the foregoing pages numbered 1
         to 44 are a true and correct transcription of my
10       shorthand notes of said deposition.

11               I further certify that said deposition was
         taken at the time and place hereinabove set forth
12       and that the taking of said deposition was commenced
         and completed as hereinabove set out.

13
                 I further certify that I am not an attorney or
14       counsel of any of the parties, nor am I a relative or
         employee of any attorney or counsel of any party
15       connected with the action, nor am I financially
         interested in the action.  The foregoing certification
16       of this transcript does not apply to any reproduction of
         the same by any means unless under the direct control
17       and/or direction of the certifying reporter.

18

19           Dated this 5th day of February, 2017.

20

21           _____

22               Cynthia Hopkins, RPR, FPR

23               Job #1520881

24

25
```

U.S. LEGAL SUPPORT
(954) 463-2933