# EXHIBIT G

April Thomas
February 06, 2017

```
            IN THE UNITED STATES DISTRICT COURT
                 MIDDLE DISTRICT OF GEORGIA
                      ATHENS DIVISION


CHRISTIE BURRELL, individually,      )
and on behalf of all others          )
similarly situated,                  ) CIVIL ACTION
                                     ) FILE NO.:
         Plaintiff,                  )
                                     ) 3:15-CV-125-CDL
v.                                   )
                                     )
TOPPERS INTERNATIONAL, INC.,         )
a domestic profit corporation,       )
DARNELL LEWIS GARDNER, individually, )
and SANDRA GARDNER, individually,    )
                                     )
         Defendants.                 )
```

            DEPOSITION OF APRIL THOMAS,

  taken at the instance of the Defendants, pursuant to

  stipulations contained herein, before Julie Breedlove,

  Certified Court Reporter, at 11:45 a.m., on February 6,

   2017, at 191 Peachtree Street, Northeast, Suite 4200,

Atlanta, Georgia.  The reading and signing of the deposition

                       were reserved.

April Thomas
February 06, 2017                                                    2

```
 1                   A P P E A R A N C E S

 2


 3   FOR THE PLAINTIFFS:

 4   Andrew Frisch, Esquire
     Morgan & Morgan, PA
 5   600 N. Pine Island Road, Suite 400
     Plantation, Florida 33324
 6   (954) 318-0268
     E-mail: afrisch@forthepeople.com
 7

 8   FOR THE DEFENDANTS:

 9   John Jay McArthur, Esquire
     McArthur, McArthur & Overend, LLP
10   Post Office Box 893
     Athens, Georgia 30603
11   (706) 353-7736
     E-mail: john@mcarthurlaw.net
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1      Q    2008?
 2      A    May-ish, I think, but I'm not sure.  I'm not 100
 3   percent sure on that one.  It's been a long time.
 4      Q    When did you last work at Toppers?
 5      A    November -- about 30th.  November 30th.
 6      Q    What year?
 7      A    2015, I think.
 8      Q    Did you work at Toppers continuously or steadily from
 9   May 2008 until November 30th of 2015?
10      A    No.  I would have to stop for certain reasons, as my
11   sickness.  I would have to take days off and not be able to
12   come in to work.
13      Q    Did you work at all during the year 2013?
14      A    20- -- yes.
15      Q    Do you know when?
16      A    No.  No, sir.
17      Q    What about 2014?
18      A    Yes.
19      Q    And 2015?
20      A    Yes, until November.
21      Q    Do you have any record of the hours you worked at
22   Toppers during 2013, '14 and '15?
23      A    No, sir.
24      Q    Do you have any knowledge of that, even if you don't
25   have any written records?
```

1      A    I was fired.

2      Q    -- in November 2015?

3      A    I was fired.

4      Q    Who fired you?

5      A    Sandra.

6      Q    And the reason?

7      A    Because it was a game day and I could not come in,

8   because I had pneumonia.  And they fired me.  You understand

9   that I've been sick over the past years.  You understand what

10  I'm saying?

11     Q    Uh-huh (affirmative).  And the illness over these

12  years --

13     A    Yes.

14     Q    The same illness you have presently?

15     A    Yes.

16     Q    Have you been treated for that?

17     A    Not yet.  I have to go to an oncologist.

18     Q    Have you had any medical treatment during that period

19  of time?

20     A    Not yet.

21     Q    None at all?  I mean, you haven't been to see a

22  doctor?

23     A    Oh, yes.  Yes.  Dr. Sepesi -- do you need their

24  names?

25     Q    Yes.

1       A    Dr. Sepesi, Dr. Joshua Sepesi in Athens, and Dr. Gary
2   Kinsey in Maysville.
3       Q    How do you spell their last names?
4       A    Sepesi -- S-e-s-p-i (sic), and Kinsey, K-i-n-s-e-y.
5       Q    And Kinsey is in Gainesville?
6       A    No -- Maysville.
7       Q    Maysville.  When you first went to work at Toppers,
8   tell me how that process went.  How did you decide to work
9   there, and what happened?
10      A    My sister -- after I had my first son, I was a single
11  mama, you know, at 18 years old.  My sister Amber had worked at
12  Chelsea's.  So we decided to go to Toppers, and that was my
13  first time ever.  And so she took me there, and I filled out an
14  application with her and signed all the agreements.  We
15  auditioned, and I worked that same very night.
16      Q    Did Amber go to work there, too?
17      A    Yes -- my sister.
18      Q    What's her last name?
19      A    Thomas.
20      Q    How long -- what years did she work at Toppers?
21      A    That was, like, 2008, when I very first started
22  working at Toppers.
23      Q    How long did she work there?
24      A    Not even two weeks, because she found out she was
25  pregnant with her daughter Harper.

1     Q    Who auditioned you?
2     A    Lawanda Lassiter.
3     Q    Anybody else?
4     A    Nope.
5     Q    Did you fill out an application that evening?
6     A    Yep.
7     Q    Did you talk with anyone else about working at
8  Toppers?
9     A    No.
10    Q    So you were hired that night?
11    A    Yep.
12    Q    What was your understanding of how would you be paid?
13    A    Tips.
14    Q    Was there any discussion of paying you an hourly wage
15  or rate?
16    A    No, sir.
17    Q    And did you know from your sister that tips was the
18  way it was usually done?
19    A    Yes.
20    Q    The entire time you were working at Toppers, did you
21  ever ask to be paid an hourly wage?
22    A    No.
23    Q    Did you understand the difference between being an
24  independent contractor and a wage employee?
25    A    Yes.

1    Q    Tell me what your understanding was.

2    A    I understand that if I'm my own business contractor,
3  I make my own schedule.  I don't have to have a set schedule.
4  And then let's say the makeup, attire, what we had to wear,
5  everything, would -- the rules changed to we had to have
6  lipstick, eye makeup, nice outfits, and always nice heels.

7    Q    Were those rules given to you in writing, or how did
8  you learn of those rules?

9    A    They made them up as they went.  When I first
10 started, they gave me a pamphlet of all the rules, but that's
11 pretty much saying no having sex in the executive rooms or
12 anything like that.  But other than that, no.

13   Q    Who informed you of the rules?

14   A    Lawanda and Kelly.

15   Q    Lawanda Lassiter and Kelly Gardner?

16   A    Yes.

17   Q    Did Sandra Gardner ever inform you of any rules?

18   A    No.

19   Q    Did Darnell Gardner ever inform you of any rules?

20   A    This would be kind of both of them, actually.  This
21 dates back to your question you just asked.  Yes, the rule that
22 I kept calling out because I was so sick.  And I had been fined
23 for that, for missing out of work because I was so sick --
24 $400, by Ms. Sandra directly.

25   Q    At one time or over a period of time?

```
 1      A    Oh, she gave me two days to pay 200 of it and then
 2  200 of it the next day.
 3      Q    And when was that?
 4      A    Oh, gosh.  I can't even remember.  It was when Kelly
 5  was still house mom -- about four and a half, five years ago.
 6      Q    And you continued working there after that incident
 7  for some time?
 8      A    Uh-huh (affirmative).
 9      Q    Why?
10      A    I'm a single mother of two boys.  I needed the money.
11      Q    What other work have you done?
12      A    I've worked at Rack Room Shoes, and I've babysat.
13      Q    Rack Room Shoes where?
14      A    In Tanger Outlets in Commerce.
15      Q    When did you work there?
16      A    When I was 17 years old, 18 years old, around that
17  age.  That's the only other job I've had other than the club.
18      Q    And babysitting -- was that --
19      A    And babysitting.
20      Q    When was that?
21      A    Let's see.  I actually babysitted recently for
22  someone who works at Toppers still.  Her name is Amanda.  I
23  babysat her two little boys.  And my neighbor -- well, used to
24  be my neighbor's two little girls, sometimes my sister's kids
25  when they need to go somewhere or on a date, you know, stuff
```

1  like that.
2     Q    You have heard Ms. Christie Burrell talk about house
3  fees and tipping out.  Is that generally accurate?
4     A    Yes.
5     Q    I won't go through all that with you again.
6     A    Well, can I say something to add on to that?
7     Q    Certainly.
8     A    Okay.  We were not allowed to work unless we paid
9  that tip-out, to work.  We would not be able to work at all,
10 period.  They would send us home, because we would have to pay
11 immediately when we walked in the door.  And on football games,
12 immediately, too -- $50 straight up.  And at the end of the
13 night, no matter what, how much you make, you have to tip
14 10 percent of what you make or a hundred dollars minimum.
15    Q    A hundred dollars minimum to whom?
16    A    The house mom, the bouncers, the house -- all that.
17    Q    Among all of them?
18    A    Yes.  Yes, sir.
19    Q    Was that on game nights or every night?
20    A    Every night that I worked.  Every night.
21    Q    What if you didn't make a hundred dollars on a slow,
22 cold, rainy winter's night?
23    A    You would have to go talk to Ms. Sandra and figure
24 out what to do about it, because right before I left, I wasn't
25 making any money.  I was very sick and not a lot of energy, and

```
 1   I wasn't making hardly any money before I left.  So -- yeah.
 2       Q    Would you be given a break on paying the hundred
 3   dollars minimum?
 4       A    Huh?
 5       Q    When you went and talked to Sandra, would you get a
 6   break on paying it, or would you have to pay it?  What would
 7   happen?
 8       A    Sometimes, yes.  It would be like a rollover, but we
 9   would still have to pay that -- like, roll over to the next day
10   or the next game day, or -- that still applies to the weekdays,
11   too.
12       Q    You said earlier that you were not allowed to work if
13   you didn't pay tip-out --
14       A    Right.
15       Q    -- when you came?
16       A    Correct.
17       Q    And that would be the house fee; is that another --
18       A    Correct.
19       Q    But you would tip out the DJs, the bartenders,
20   security, house moms at the end of the evening?
21       A    Yes, sir.
22       Q    You heard Ms. Burrell's testimony also regarding
23   scheduling.  Was that generally accurate as to how that worked?
24       A    Yes, sir.
25       Q    Anything you want to add to that?
```

1     A    About a year before I got fired, they made it
2  mandatory with the day that you had to come in at 7 o'clock,
3  and -- because there was too many girls that wanted to work
4  during the weekdays and the weekend, so they made it mandatory
5  to come in one set day, either Monday or Tuesday, at 7 o'clock.
6  And if you didn't do that, you couldn't work the rest of the
7  week.  Or if you missed, let's say, a Monday or a Tuesday or a
8  Wednesday, you can't work that Thursday, Friday, or Saturday,
9  if you're sick or anything like that.
10    Q    Mondays and Tuesdays would generally be the slower
11 days; is that correct?
12    A    Yes, and that's when they made it to be where we were
13 all -- we had to, you know, one day out of the month choose one
14 of those days to work.
15    Q    Tell me where you went to school.
16    A    Jackson County High School.
17    Q    Did you graduate?
18    A    No, sir.
19    Q    When did you last go there?
20    A    2007.
21    Q    And what grade did you complete there?
22    A    Ninth.
23    Q    Did you later have any further education?
24    A    No, but I'm proceeding to further my education when I
25 get better.

```
 1  STATE OF GEORGIA

 2  COUNTY OF GWINNETT

 3  WITNESS:  APRIL THOMAS

 4       Pursuant to Article 8.B of the Rules and Regulations of

 5  the Board of Court Reporting of the Judicial Council of

 6  Georgia, I make the following disclosure:

 7       I am a Georgia Certified Court Reporter.  I am here as an

 8  independent contractor to US Legal Support, Inc.

 9       US Legal Support, Inc. was contacted by the offices of

10  McArthur, McArthur & Overend, LLP, to provide court reporting

11  services for this deposition.  The firm will not be taking this

12  deposition under any contract that is prohibited by OCGA

13  15-14-37(a) and (b).

14       US Legal Support, Inc. has an agreement to provide court

15  reporting services with McArthur, McArthur & Overend, the terms

16  of which are as follows:  Any and all special rates and/or

17  services are available to all parties involved in this

18  litigation.

19       I am not disqualified for interest, personal or financial,

20  under OCGA 9-11-28(c).

21       This, the 6th day of February 2017.

22                                              Julie Breedlove
                                          Certified Court Reporter
23                                       Georgia Certificate No. 2864

24

25
```

```
 1                    C E R T I F I C A T E

 2   STATE OF GEORGIA

 3   COUNTY OF GWINNETT

 4        I hereby certify that the foregoing deposition was taken

 5   down by me and that the foregoing transcript is a true and

 6   correct record given to the best of my ability.

 7        The above certification is expressly withdrawn upon the

 8   disassembly or photocopying of the foregoing transcript, unless

 9   said disassembly or photocopying is done under the auspices of

10   US Legal Support, Inc. and the signature and original seal is

11   attached thereto.

12        I further certify that I am not a relative, employee,

13   attorney, or counsel of any of the parties; nor am I

14   financially interested in the action.

15        This, the 13th day of February 2017.

16
                           Julie Breedlove
17        _____

18        Julie Breedlove
          Certified Court Reporter
19        Georgia Certificate Number 2864

20

21

22

23

24

25
```